# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.:          2022AP13

†Petition for Review filed

Complete Title of Case:


**AMAZON LOGISTICS, INC.,**

      **PLAINTIFF-RESPONDENT,†**

    V.

**LABOR AND INDUSTRY REVIEW COMMISSION,**

      **DEFENDANT-APPELLANT,**

      **DEPARTMENT OF WORKFORCE DEVELOPMENT
UI DIV. BUREAU OF LEGAL AFFAIRS,**

      **DEFENDANT-CO-APPELLANT.**


| | |
|---|---|
| Opinion Filed: | April 6, 2023 |
| Submitted on Briefs: | August 15, 2022 |

| | |
|---|---|
| JUDGES: | Kloppenburg, Fitzpatrick, and Nashold, JJ. |
|    Concurred: | |
|    Dissented: | |

| | |
|---|---|
| Appellant<br>ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *Jeffrey J. Shampo* of Labor and Industry Review Commission.<br><br>On behalf of the defendant-co-appellant, the cause was submitted on the briefs of *Christine L. Galinat* of Department of Workforce Development, Bureau of Legal Affairs. |

Respondent
ATTORNEYS: On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Erik K. Eisenmann* and *Emily Logan Stedman* of *Husch Blackwell LLP*, Madison; *Stephanie Schuster* of *Morgan, Lewis & Bockius LLP*, Washington, D.C.; and *Christopher K. Ramsey* of *Morgan, Lewis & Bockius LLP*, Pittsburgh, Pennsylvania.

**COURT OF APPEALS
DECISION
DATED AND FILED**

**April 6, 2023**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP13**

**STATE OF WISCONSIN**

Cir. Ct. No. 2020CV579

**IN COURT OF APPEALS**

---

**AMAZON LOGISTICS, INC.,**

    **PLAINTIFF-RESPONDENT,**

  **V.**

**LABOR AND INDUSTRY REVIEW COMMISSION,**

    **DEFENDANT-APPELLANT,**

**DEPARTMENT OF WORKFORCE DEVELOPMENT
UI DIV. BUREAU OF LEGAL AFFAIRS,**

    **DEFENDANT-CO-APPELLANT.**

---

APPEAL from an order of the circuit court for Waukesha County: MICHAEL O. BOHREN, Judge. *Reversed and cause remanded with directions.*

Before Kloppenburg, Fitzpatrick, and Nashold, JJ.

¶1 FITZPATRICK, J. This appeal concerns whether individuals who performed package delivery services for Amazon Logistics, Inc. ("Amazon Logistics") qualify as "employees" under WIS. STAT. § 108.02(12) (2021-22)[1] for unemployment insurance taxation purposes. Pursuant to that statutory subpart, these individuals—referred to by Amazon Logistics as "delivery partners"—qualify as employees unless Amazon Logistics proved, as pertinent here, that the delivery partners met at least six of nine factors. *See* § 108.02(12)(bm)2.a.-i.

¶2 The Department of Workforce Development ("the Department") conducted an audit of the services performed by more than 1,000 Amazon Logistics delivery partners during portions of 2016, 2017, and 2018. The Department determined that nearly all of these delivery partners qualified as employees under WIS. STAT. § 108.02(12) during that time although Amazon Logistics did not consider those persons to be its employees. As a result, the Department assessed Amazon Logistics over $200,000 in delinquent unemployment insurance taxes, with related penalties and interest.

¶3 The Labor and Industry Review Commission ("LIRC") upheld the Department's determination and concluded that Amazon Logistics proved only one of the nine factors under WIS. STAT. § 108.02(12)(bm)2. Amazon Logistics appealed LIRC's decision to the Waukesha County Circuit Court. That court set aside LIRC's decision and concluded that Amazon Logistics proved all nine statutory factors. The Department and LIRC each appeal the circuit court's order.

---

[1] The text of WIS. STAT. § 108.02(12) is reproduced in pertinent part later in this opinion. The 2017-18 version of the Wisconsin Statutes applies to this dispute, and the relevant language of that version of the statutes is identical to the language in the 2021-22 version. Thus, for ease of reference, all references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

¶4      We conclude that Amazon Logistics has satisfied its burden as to five of the nine factors under WIS. STAT. § 108.02(12)(bm)2.  Accordingly, we also conclude that LIRC correctly determined that these delivery partners qualified as employees for unemployment insurance taxation purposes.  Therefore, we reverse the order of the circuit court and remand to the court with directions to enter an order consistent with this opinion confirming LIRC's decision.[2]

## BACKGROUND

¶5      The following facts are largely taken from LIRC's findings of fact, which we generally accept as conclusive.  *See* WIS. STAT. § 108.09(7)(c)1.[3]

¶6      Amazon Logistics coordinates the delivery of products purchased by customers of Amazon.com.  Amazon Logistics contracts with entities to move and deliver packages, including UPS, the United States Postal Service, and FedEx.

¶7      In addition, Amazon Logistics created a program called "Amazon Flex" that utilized a smartphone application to coordinate package deliveries made by individual drivers.  An individual interested in participating in this program was

---

[2]  We emphasize that our conclusions concerning some disputed factors, and this result, are based on this administrative record regarding the delivery partners' services and actions during the period covered by the Department's audit.  Accordingly, any changes in the nature of Amazon Logistics' delivery partners' services and actions after the Department's audit, as may arise in a separate case with a record different from the record in this case, may lead to a different result.

[3]  "The findings of fact made by the commission acting within its powers shall, in the absence of fraud, be conclusive."  WIS. STAT. § 108.09(7)(c)1.  None of the parties assert that LIRC's findings of fact are fraudulent.

Separately, we note that Amazon Logistics' response brief cites to the parties' appendices instead of the record.  On appeal, a party must include appropriate factual references to the record in its briefing.  WIS. STAT. RULE 809.19(1)(d)-(e).  The appendix is not the record.  ***United Rentals, Inc. v. City of Madison***, 2007 WI App 131, ¶1 n.2, 302 Wis. 2d 245, 733 N.W.2d 322.  We remind counsel of the obligation to comply with the Rules of Appellate Procedure.  *See* WIS. STAT. RULE 809.83(2).

required to download the Amazon Flex software application (the "Flex app") from Amazon Logistics' website and apply to perform delivery services for Amazon Logistics as a delivery partner. As part of the application process, the delivery partners were required to agree to the "Amazon Flex Independent Contractor Terms of Service" ("the Agreement").

¶8 Once an individual was approved for the Amazon Flex program, the individual could view available "delivery blocks" in the Flex app. A delivery block is a period of time—usually two to four hours—that was based on Amazon Logistics' estimate of the amount of time that a delivery partner would need to deliver a certain collection of packages. Amazon Logistics paid the delivery partners what it referred to as a "service fee" to complete a delivery block.

¶9 After a delivery partner selected an available delivery block, the Flex app directed the delivery partner to Amazon Logistics' warehouse in Milwaukee. At the warehouse, the delivery partner drove their vehicle into the warehouse and was directed to an open parking spot next to a rack containing packages. The delivery partner scanned the packages on the rack using the Flex app on their smartphone and then loaded those packages into their vehicle. The delivery partners were not able to choose from among the available racks to obtain a particular geographical delivery area and were not able to negotiate the geographical area associated with a delivery block.

¶10 After loading the packages into their vehicle, the delivery partner received from the Flex app a suggested route for the delivery of the packages. The delivery partner was free to follow the suggested route or devise a route of their preference. Upon delivering a package at its destination, the delivery partner scanned the package using their smartphone and indicated through the Flex app that

the delivery was completed. The delivery partner was required to return any undeliverable packages to the warehouse at the end of their route. After the delivery partner completed a delivery block, Amazon Logistics paid the service fee associated with the delivery block even if the delivery partner was unable to deliver all of the packages assigned within the delivery block.

¶11    In 2018, the Department requested a list of individuals who performed services as delivery partners during 2016 and 2017 and to whom Amazon Logistics had issued an Internal Revenue Service form 1099.[4]  The Department conducted what was referred to as an "audit" of those delivery partners and concluded that, of the more than 1,000 individuals subject to the audit, all but two of the individuals qualified as "employees" of Amazon Logistics for unemployment insurance taxation purposes.  The Department determined that Amazon Logistics owed $205,436.45 in unemployment insurance taxes, penalties, and interest concerning those delivery partners who were not reported by Amazon Logistics as employees to the Department during the pertinent portions of 2016, 2017, and 2018.[5]

---

[4] The IRS Form 1099 is used to report certain types of non-employment income to the IRS, such as pay received as an independent contractor. *See Greco v. United States*, 380 F. Supp. 2d 598, 613 (M.D. Pa. 2005).

[5] Specifically, the Department determined that Amazon Logistics owed these taxes, penalties, and interest for the final three quarters of 2016, the entire calendar year of 2017, and the first two quarters of 2018.  The amounts owed for the first two quarters of 2018 were based on estimated wages.  LIRC also noted that the Department's audit initially included the first quarter of 2016, but the Department agreed during the administrative proceedings that Amazon Logistics did not operate in Wisconsin during that time.  As a result, the Department adjusted the total amount assessed, although LIRC's decision does not state exactly how much was adjusted at that point.  In any event, the parties do not dispute LIRC's findings as to the Department's calculations or the time period during which the delivery partners performed the services at issue in this case.

¶12    Amazon Logistics appealed the Department's audit determination, and a hearing was held before an Administrative Law Judge in the Department's Unemployment Insurance Division. During this hearing, the Department presented testimony from its auditor and one individual who had previously performed services for Amazon Logistics as a delivery partner. Amazon Logistics presented testimony from two management-level employees. The Administrative Law Judge affirmed the Department's audit determination, concluding that the Department properly classified the delivery partners as employees pursuant to WIS. STAT. § 108.02(12).

¶13    Amazon Logistics petitioned LIRC for review of the Administrative Law Judge's decision. LIRC reviewed the evidence submitted at the hearing, set forth its findings of fact, and, relevant to this appeal, concluded that Amazon Logistics demonstrated that only one of the nine factors of WIS. STAT. § 108.02(12)(bm)2. had been met. As a result, LIRC further concluded that Amazon Logistics failed to meet its burden of proving that the delivery partners did not qualify as employees pursuant to § 108.02(12).

¶14    Amazon Logistics commenced an action against the Department and LIRC in the circuit court for judicial review of LIRC's decision. That court set aside LIRC's decision, concluding that Amazon Logistics had met its burden because it

---

We also note that LIRC's findings of fact did not break into discrete components the amounts owed for unemployment insurance taxes, penalties, and interest. Nonetheless, Amazon Logistics does not dispute that, if the delivery partners identified by the Department qualify as employees, the total amount assessed by the Department for those taxes, penalties, and interest to that date has been accurately stated.

established that all nine factors of WIS. STAT. § 108.02(12)(bm)2. had been met. The Department and LIRC each appeal the circuit court's order.[6]

¶15    Additional material facts are set forth in the following discussion.

## DISCUSSION

¶16    On appeal, the Department and LIRC (collectively, "the Department")[7] argue that LIRC properly concluded that the delivery partners who performed services for Amazon Logistics qualify as employees pursuant to WIS. STAT. § 108.02(12). We begin by setting forth the standard of review and governing principles regarding LIRC's decisions, deference to LIRC's legal conclusions, and construction of the applicable statutes.

### I.  Standard of Review and Governing Principles Regarding LIRC's Decisions, Deference to LIRC's Legal Conclusions, and Interpretation of WIS. STAT. Ch. 108.

#### A.  Judicial Review of LIRC's Decisions.

¶17    This court reviews LIRC's decisions in unemployment insurance cases pursuant to WIS. STAT. § 108.09(7).  *See Schiller v. DILHR*, 103 Wis. 2d 353, 355, 309 N.W.2d 5 (Ct. App. 1981).  We review the decision of LIRC, not the order of the circuit court.  *Gilbert v. LIRC*, 2008 WI App 173, ¶8, 315 Wis. 2d 726, 762

---

[6] The Department and LIRC each selected District IV of the Wisconsin Court of Appeals as venue for the appeal of the circuit court's order.  *See* WIS. STAT. § 752.21(2).

[7] The Department and LIRC filed separate briefs with this court.  LIRC's brief largely adopts the arguments in the Department's brief.  Thus, for ease of reading, when LIRC has adopted the Department's arguments on appeal, we refer to the arguments of the Department.  When the Department and LIRC adopt different arguments, those are indicated accordingly.

N.W.2d 671.  Pertinent here, this court may "set aside" LIRC's decision only if LIRC acted "without or in excess of its powers," § 108.09(7)(c)6.a., or if LIRC's findings of fact are not supported by the evidence, § 108.09(7)(f).[8]

¶18    LIRC acts "without or in excess of its powers" if it bases an order on an incorrect interpretation of a statute.  *DWD v. LIRC*, 2018 WI 77, ¶12, 382 Wis. 2d 611, 914 N.W.2d 625.  When interpreting statutes, Wisconsin courts begin "with the language of the statute.  If the meaning of the statute is plain, we ordinarily stop the inquiry."  *State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (citation omitted).  "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *Id.*; *see* WIS. STAT. § 990.01(1).  As discussed in more detail below, the application of a statute to undisputed facts is a question of law that we review de novo.  *DOR v. Menasha Corp.*, 2008 WI 88, ¶44, 311 Wis. 2d 579, 754 N.W.2d 95; *Tetra Tech EC, Inc. v. DOR*, 2018 WI 75, ¶84, 382 Wis. 2d 496, 914 N.W.2d 21.

¶19    We may also "set aside the commission's order and remand the case to the commission if the commission's order depends on any material and controverted finding of fact that is not supported by credible and substantial evidence."  WIS. STAT. § 108.09(7)(f).  Credible evidence is that which is "sufficient to exclude speculation or conjecture."  *Bumpas v. DILHR*, 95 Wis. 2d 334, 343, 290 N.W.2d 504 (1980).  Substantial evidence is "[e]vidence that is relevant, probative, and credible, and which is in a quantum that will permit a reasonable

---

[8] This court may also set aside LIRC's decision if the order was procured by fraud.  WIS. STAT. § 108.09(7)(c)6.b.  None of the parties contend that LIRC's decision was procured by fraud.

factfinder to base a conclusion upon it." ***Princess House, Inc. v. DILHR***, 111 Wis. 2d 46, 54, 330 N.W.2d 169 (1983).

¶20 Additionally, our review of LIRC's decision requires that we interpret the terms of the Agreement.[9] The interpretation of an unambiguous contract is a question of law that we review de novo.[10] ***Town Bank v. City Real Est. Dev., LLC***, 2010 WI 134, ¶32, 330 Wis. 2d 340, 793 N.W.2d 476. As discussed in more detail below, we also review an agency's conclusions of law de novo. ***Tetra Tech***, 382 Wis. 2d 496, ¶84. Therefore, we do not defer to LIRC's interpretation of an unambiguous contract. *See* ***McAdams v. Marquette Univ.***, 2018 WI 88, ¶51 n.17, 383 Wis. 2d 358, 914 N.W.2d 708 (extending ***Tetra Tech***'s holding to questions of contract interpretation); ***Wisconsin End-User Gas Ass'n v. PSC***, 218 Wis. 2d 558, 565, 581 N.W.2d 556 (Ct. App. 1998) ("[A]n agency's construction of a contract is subject to de novo review by this court.").

## B. Deference to LIRC's Legal Conclusions.

¶21 In ***Tetra Tech***, our supreme court ended Wisconsin courts' practice of deferring to conclusions of law of administrative agencies and held that we review agencies' conclusions of law de novo. ***Tetra Tech***, 382 Wis. 2d 496, ¶¶3, 108. The supreme court also recognized that, when considering an agency's arguments in the course of reviewing an agency's decision pursuant to WIS. STAT. ch. 227, a court

---

[9] The Agreement states that interpretation of the Agreement is governed by the law of the State of Washington. However, the parties do not identify any way in which Washington law is materially different from Wisconsin law regarding the interpretation of a contract such as the Agreement. Therefore, we apply Wisconsin law in interpreting the Agreement.

[10] The parties do not argue that the Agreement is ambiguous, and we do not discern any material ambiguity in that contract.

accords "due weight" to the agency's "experience, technical competence, and specialized knowledge." *Id.*, ¶¶3, 108 (quoting § 227.57(10)).

¶22 The Department does not dispute that we must review LIRC's conclusions of law de novo. Nevertheless, the Department argues that *Tetra Tech* requires that we give due weight to LIRC's legal conclusions interpreting WIS. STAT. § 108.02(12). In response, Amazon Logistics argues that we should not give LIRC's decision any persuasive weight. Amazon Logistics contends that the concept of due weight review announced in *Tetra Tech* applies only to judicial review of an agency decision under WIS. STAT. § 227.57(10). *See id.*, ¶11 n.8 ("While chapter 227 applies to judicial review of most administrative decisions, it does not apply to all."). Here, LIRC's decision is subject to review solely according to WIS. STAT. § 108.09(7), which states in pertinent part that "[t]he order of the commission is subject to review only as provided in this subsection and not under ch. 227." Sec. 108.09(7)(c)1. As a result, Amazon Logistics asserts that the principle of due weight recognized in *Tetra Tech* does not apply to LIRC's decision here.

¶23 As the parties observe, this court has not consistently applied the principle of due weight asserted in *Tetra Tech* in cases in which the review of an agency decision is not governed by WIS. STAT. ch. 227. In *Anderson v. LIRC*, 2021 WI App 44, 398 Wis. 2d 668, 963 N.W.2d 89, *review denied* (WI Nov. 17, 2021) (No. 2020AP27), this court reviewed a decision of LIRC pursuant to WIS. STAT. § 102.23. *Anderson*, 398 Wis. 2d 668, ¶10. This court ruled that LIRC's technical expertise and specialized knowledge were not subject to due weight deference under chapter 227 because § 102.23(1)(a)1. specifically states that chapter 227 does not apply to LIRC's decision. *Id.*, ¶11 n.5. By contrast, in *Mueller v. LIRC*, 2019 WI App 50, 388 Wis. 2d 602, 933 N.W.2d 645, this court reviewed a decision of LIRC

pursuant to § 102.23 and stated that it was giving due weight to LIRC's technical expertise and specialized knowledge "in evaluating the persuasiveness of [LIRC's] arguments." *Mueller*, 388 Wis. 2d 602, ¶17.

¶24 To the extent that *Tetra Tech* recognized that a court gives due weight to an agency's technical expertise and specialized knowledge as the court considers the agency's arguments, the parties' dispute on this point is immaterial because, as stated above and as the parties agree, we review LIRC's conclusions of law de novo. Similarly, to the extent that there is any inconsistency among the applicable statutes, *Tetra Tech*, and *Anderson* on the one hand, and *Mueller* on the other hand, such inconsistency is also immaterial because we review LIRC's conclusions of law de novo. In other words, "our conclusions remain the same whether or not we give 'due weight'" deference to an agency's technical expertise and specialized knowledge in this case. *See Catholic Charities Bureau, Inc. v. LIRC*, 2023 WI App 12, ¶19 n.9, 406 Wis. 2d 586, 987 N.W.2d 778 (questioning whether due weight is appropriately afforded in proceedings under WIS. STAT. ch. 108 rather than solely in administrative proceedings under WIS. STAT. ch. 227).[11]

---

[11] In a letter of supplemental authority, LIRC informed us that this court's recent opinion in *Catholic Charities* suggests that we may afford due weight to administrative agency decisions under WIS. STAT. ch. 108. However, approximately one week later, LIRC informed us that this court withdrew its opinion in *Catholic Charities*, and LIRC asked us to disregard its letter. Later, this court reissued its opinion and explained that it "questioned whether 'due weight' is appropriately afforded to proceedings under ch. 108, rather than only to general administrative proceedings under WIS. STAT. ch. 227." *Catholic Charities Bureau, Inc. v. LIRC*, 2023 WI App 12, ¶19 n.9, 406 Wis. 2d 586, 987 N.W.2d 778.

### C. Interpretation of WIS. STAT. § 108.02(12).

¶25 This appeal requires us to interpret WIS. STAT. § 108.02(12). The Department argues that it is a remedial statute that must be "liberally construed." As our supreme court has explained:

> Wisconsin's unemployment compensation statutes embody a strong public policy in favor of compensating the unemployed. This policy is codified in WIS. STAT. § 108.01.…
>
> Consistent with this policy, WIS. STAT. ch. 108 is "liberally construed to effect unemployment compensation coverage for workers who are economically dependent upon others in respect to their wage-earning status."

*Operton v. LIRC*, 2017 WI 46, ¶¶31-32, 375 Wis. 2d 1, 894 N.W.2d 426 (quoting *Princess House*, 111 Wis. 2d at 62). Because chapter 108 is to be "liberally construed," the Department argues that the exceptions set forth in § 108.02(12)(bm) must be "strictly … construed." *See McNeil v. Hansen*, 2007 WI 56, ¶10, 300 Wis. 2d 358, 731 N.W.2d 273 ("If a statute is liberally construed, 'it follows that the exceptions must be narrowly construed.'" (citation omitted)).

¶26 We do not accept the Department's assertion that WIS. STAT. § 108.02(12) must always be liberally construed or, with respect to the exception under § 108.02(12)(bm), strictly construed. Instead, when interpreting the language in § 108.02(12), we must first ascertain the plain meaning of that statutory language. *DOJ v. DWD*, 2015 WI 114, ¶31, 365 Wis. 2d 694, 875 N.W.2d 545 (holding that a statute cannot be liberally construed until the statutory language is given its "common, ordinary, and accepted meaning[s]" or its "special definitional meaning[s]" if definitions are provided (quoting *Kalal*, 271 Wis. 2d 633, ¶45)). Only if the plain meaning analysis reveals ambiguity in the statutory language may we liberally or strictly construe that language. *Id.*, ¶32 ("[A] provision can be

construed 'liberally' as opposed to 'strictly' only when there is some ambiguity to construe."); ***Kannenberg v. LIRC***, 213 Wis. 2d 373, 393, 571 N.W.2d 165 (Ct. App. 1997) ("When statutory language is ambiguous and a choice must be made between two reasonable interpretations, one of the factors to consider in making this choice, if the statute is remedial in nature, is that it is to be liberally construed to effectuate its remedial purpose.").

¶27    As explained in the following analysis, we conclude that the pertinent portions of WIS. STAT. § 108.02(12) are not ambiguous.  Therefore, we need not liberally construe that statutory subpart.

## II.  LIRC Properly Concluded that the Delivery Partners Qualify as Employees Under WIS. STAT. § 108.02(12).

¶28    Under WIS. STAT. § 108.02(12)(a), the term "employee" is defined as "any individual who is or has been performing services for pay for an employing unit, whether or not the individual is paid directly by the employing unit." Sec. 108.02(12)(a).  LIRC concluded that the delivery partners performed services for pay for Amazon Logistics and that Amazon Logistics is an "employing unit." The parties do not dispute those conclusions on appeal.

¶29    If an individual performed services for pay, "the individual is presumed to be an employee for purposes of unemployment compensation and the burden shifts to the [employing unit] to prove that the individual is exempt" under one of the exceptions to WIS. STAT. § 108.02(12)(a).  ***Gilbert***, 315 Wis. 2d 726, ¶33. Pursuant to § 108.02(12)(bm), Amazon Logistics can rebut the presumption that the delivery partners were its employees by demonstrating two conditions, both "by contract and in fact."  Sec. 108.02(12)(bm).  The first condition requires proof that "[t]he services of the individual are performed free from control or direction by the

employing unit over the performance of [the individual's] services."
Sec. 108.02(12)(bm)1. LIRC concluded that Amazon Logistics satisfied this condition, and the parties do not dispute this conclusion on appeal.

¶30 The second condition of WIS. STAT. § 108.02(12)(bm) requires that Amazon Logistics prove (in the words of the statutory subpart, "satisfies the department") that a delivery partner met at least six of the following nine factors which we now quote:

> a. The individual advertises or otherwise affirmatively holds himself or herself out as being in business.
>
> b. The individual maintains his or her own office or performs most of the services in a facility or location chosen by the individual and uses his or her own equipment or materials in performing the services.
>
> c. The individual operates under multiple contracts with one or more employing units to perform specific services.
>
> d. The individual incurs the main expenses related to the services that he or she performs under contract.
>
> e. The individual is obligated to redo unsatisfactory work for no additional compensation or is subject to a monetary penalty for unsatisfactory work.
>
> f. The services performed by the individual do not directly relate to the employing unit retaining the services.
>
> g. The individual may realize a profit or suffer a loss under contracts to perform such services.
>
> h. The individual has recurring business liabilities or obligations.
>
> i. The individual is not economically dependent upon a particular employing unit with respect to the services being performed.

Sec. 108.02(12)(bm)2.

¶31    On appeal, the Department argues that Amazon Logistics failed to satisfy its burden as to any of these nine factors. LIRC argues that Amazon Logistics failed to satisfy its burden as to eight of the nine factors. Amazon Logistics argues that it satisfied its burden as to all nine factors. We address each factor in turn.

**A.  Amazon Logistics Failed to Prove That the Delivery Partners Advertised or Otherwise Affirmatively Held Themselves Out as Being in Business.**

¶32    The first factor in WIS. STAT. § 108.02(12)(bm)2. requires proof that "[t]he individual advertises or otherwise affirmatively holds [the individual] out as being in business." Sec. 108.02(12)(bm)2.a. In *Keeler v. LIRC*, 154 Wis. 2d 626, 453 N.W.2d 902 (Ct. App. 1990), this court concluded that one factor to consider when analyzing if an individual is an employee as defined in chapter 108 concerns whether the individual is "[a]dvertising or holding out." *Keeler*, 154 Wis. 2d. at 633. This court explained that this factor "deals with the concept that a truly independent contractor will advertise or hold out to the public or at least to a certain class of customers, the existence of its independent business." *Id.* The "[a]dvertising or holding out" test announced in *Keeler* remains a reasonable interpretation of the current language of § 108.02(12)(bm)2.a., and the parties agree that this test from *Keeler* helps guide our interpretation.

¶33    LIRC determined that Amazon Logistics did not satisfy its burden as to this factor because the only pertinent evidence presented at the hearing was the testimony of one former delivery partner. According to LIRC, this individual did not "advertise or otherwise hold himself out as being in the business" of delivering packages, and he "did not attempt to inform anyone other than Amazon Logistics that he was willing and able to perform delivery services." We defer to these findings of fact which weigh heavily against concluding that Amazon Logistics has

satisfied its burden as to this factor. WIS. STAT. § 108.09(7)(c)1. ("The findings of fact made by the commission acting within its powers shall … be conclusive.").

¶34 Amazon Logistics does not dispute LIRC's finding that there was no testimony from delivery partners that they advertised or held out to the public that they were providing delivery services. Instead, Amazon Logistics argues that the delivery partners held themselves out as being in business by merely registering with the Flex app and thereby notifying Amazon Logistics that they were available to perform delivery services. According to Amazon Logistics, this argument is supported by this court's unpublished judge-authored opinion in *Varsity Tutors LLC v. LIRC*, 2019 WI App 65, No. 2018AP1951, unpublished slip op. (WI App Oct. 15, 2019), and LIRC's decision in *Ebenhoe v. Lyft, Inc.*, UI Dec. Hearing No. 16002409MD (LIRC Jan. 20, 2017).[12]

¶35 In *Varsity Tutors*, an individual entered into a contract with Varsity Tutors to perform tutoring services for students. *Varsity Tutors*, 2019 WI App 65, No. 2018AP1951, ¶3. The individual created a profile on Varsity Tutors' website offering her tutoring services for purchase through Varsity Tutors' online platform. *Id.*, ¶5. This court determined that the individual held herself out as being in the business of tutoring because she used Varsity Tutors' online platform to advertise her tutoring services to students. *Id.*, ¶25. In *Ebenhoe*, an individual entered into a contract with Lyft to provide rideshare services for customers. *Ebenhoe*, UI Dec. Hearing No. 16002409MD. Material to this factor, LIRC concluded that the individual "h[eld] himself out to a certain class of customers, i.e., passengers

---

[12] As explained, we are not bound by LIRC's conclusions of law. *Tetra Tech EC, Inc. v. DOR*, 2018 WI 75, ¶84, 382 Wis. 2d 496, 914 N.W.2d 21. However, we may consider the parties' arguments based on prior LIRC decisions although we are not bound by those decisions.

seeking digital connection to transportation services, as being available as a driver." *Id.*

¶36 Amazon Logistics contends that, like the tutor in *Varsity Tutors* and the driver in *Ebenhoe*, the delivery partners made known that they were in the business of providing delivery services by registering with Amazon Logistics through the Flex app and, as a result, Amazon Logistics has satisfied its burden as to this factor. We are not persuaded. In *Varsity Tutors* and *Ebenhoe*, the individuals used a digital platform to advertise their services to third parties—*i.e.*, students seeking tutoring services and individuals seeking rideshare services. As this court recognized in *Keeler*, this communication to the "public" or "a certain class of customers" is the type of conduct that this factor contemplates. *Keeler*, 154 Wis. 2d at 633. In this matter, the record indicates that the delivery partners used the Flex app only to communicate with Amazon Logistics, and not to advertise or offer their services to the wider public or third parties seeking delivery services. With the Flex app, the delivery partners were entirely dependent on Amazon Logistics to offer opportunities to provide delivery services, and the delivery partners could not use the Flex app to solicit other delivery opportunities from the public or Amazon.com customers. Thus, the material facts in *Varsity Tutors* and *Ebenhoe* are distinguishable from the operative facts in this matter.[13]

¶37 In a similar vein, Amazon Logistics argues that the delivery partners did not need to hold themselves out to more than one customer to satisfy the factor

---

[13] Amazon Logistics also argues that delivery partners were similar to the tutor in *Varsity Tutors LLC v. LIRC*, 2019 WI App 65, No. 2018AP1951, unpublished slip op. (WI App Oct. 15, 2019), and the driver in *Ebenhoe v. Lyft, Inc.*, UI Dec. Hearing No. 16002409MD (LIRC Jan. 20, 2017), because the delivery partners could "choose to accept or not accept specific delivery opportunities." We reject this argument because Amazon Logistics does not explain how that fact is probative of whether delivery partners advertised or held themselves out as being in business.

set forth in WIS. STAT. § 108.02(12)(bm)2.a. According to Amazon Logistics, this factor is not concerned "with how many clients [an individual] solicits (at all or per platform) or the types of platforms he or she chooses to use." This contention fails because Amazon Logistics is essentially arguing that this factor can be satisfied any time an individual applies to provide services for even one employing unit. As we explained in *Keeler*, this factor "deals with the concept that a truly independent contractor will advertise or hold out to the *public or at least to a certain class of customers*, the existence of its independent business." *Id.* (emphasis added). Holding oneself out to a single business by virtue of filling out an application does not come within the test this court stated in *Keeler*. The proper consideration concerning this factor is whether the individual communicates to the public or a certain class of customers that the individual has an independent business and is available to perform services, not whether the individual has ever offered to perform services for the one purported employing unit. Thus, we conclude that the delivery partners did not advertise or hold themselves as being in business simply by registering with the Flex app.

¶38 Next, Amazon Logistics asserts that the delivery partners, like other participants in what Amazon Logistics refers to as the "gig" economy, held out their services generally because they were able to provide services on other digital platforms, such as Uber, Lyft, or Instacart. However, Amazon Logistics does not point to any evidence in the record that the delivery partners performed services on other digital platforms. As explained, this factor requires proof that an individual actually advertises or affirmatively holds the individual out as being in business, not merely that the individual could hypothetically do so. WIS. STAT. § 108.02(12)(bm)2.a. (the employing unit must prove that "[t]he individual

*advertises* or otherwise *affirmatively holds [the individual] out* as being in business" (emphasis added)).

¶39    In sum, we conclude that Amazon Logistics did not meet its burden as to the factor set forth in WIS. STAT. § 108.02(12)(bm)2.a..

### B. The Delivery Partners Performed Most of the Services in a Location of Their Choosing and Used Their Own Equipment or Materials in Performing the Services.

¶40    The second factor in WIS. STAT. § 108.02(12)(bm)2. requires that "[t]he individual maintains [the individual's] own office or performs most of the services in a facility or location chosen by the individual *and* uses [the individual's] own equipment or materials in performing the services." Sec. 108.02(12)(bm)2.b. (emphasis added). This is a two-part inquiry. The first element requires that the individual either maintains the individual's own office *or* performs most of the services in a facility or location chosen by the individual. The second element requires that the individual uses the individual's own equipment or materials in performing the services. Interpreting a former version of § 108.02(12), we held that this factor "asks whether the worker has maintained a separate business with the features of an actual business." *Gilbert*, 315 Wis. 2d 726, ¶¶34-35, 38 (citing § 108.02(12)(b)2.a., (bm)3. (2005-06)).[14] The language of the current version of § 108.02(12)(bm)2.b. is not identical to the language in the former version of that subpart that we analyzed in *Gilbert*, but the language is in most material respects

---

[14] The version of this factor that was interpreted in *Gilbert* required that the individual "maintains a separate business with [the individual's] own office, equipment, materials and other facilities." *Gilbert v. LIRC*, 2008 WI App 173, ¶34, 315 Wis. 2d 726, 762 N.W.2d 671 (citing WIS. STAT. § 108.02(12)(b)2.a. (2005-06)). *Gilbert* also referenced § 108.02(12)(bm)3. (2005-06), which contained language identical to paragraph (b)2.a. (2005-06). *Id.*, ¶35.

the same, and the general purpose of this factor announced in *Gilbert* still applies to the current version of § 108.02(12)(bm)2.b.

¶41    As to the first element of this factor, LIRC concluded that the delivery partners neither maintained their own offices nor chose the facility or location for performing their services. As to the second element of this factor, LIRC concluded that Amazon Logistics met its burden to show that the delivery partners used their own equipment in performing delivery services because the delivery partners used their own vehicles and smartphones as part of their work.

¶42    For the following reasons, we conclude that Amazon Logistics met its burden on both elements of this factor. We next address each element of WIS. STAT. § 108.02(12)(bm)2.b.

### 1. The Delivery Partners Did Not Maintain Their Own Offices.

¶43    On appeal, Amazon Logistics argues that the delivery partners maintained their own offices because the word "office" includes the delivery partners' vehicles. We are not persuaded.[15]

¶44    As noted, in ascertaining the plain meaning of a statute, we give statutory language "its common, ordinary, and accepted meaning." *Kalal*, 271 Wis. 2d 633, ¶45. "A dictionary may be utilized to guide the common, ordinary meaning

---

[15] LIRC's decision indicates that Amazon Logistics did not argue that the delivery partners' vehicles qualify as offices. Our own review of Amazon Logistics' briefing to LIRC and the circuit court confirms that Amazon Logistics did not raise this argument until its briefing to this court on appeal. Therefore, as a separate basis to reject Amazon Logistics' argument, we could also conclude that Amazon Logistics has forfeited its argument that a delivery partner's vehicle is an "office." *See DOJ v. DWD*, 2015 WI App 22, ¶18, 361 Wis. 2d 196, 861 N.W.2d 789, *aff'd*, 2015 WI 114, 365 Wis. 2d 694, 875 N.W.2d 545 ("[A] party's failure to properly raise an issue before the administrative agency generally forfeits the right to raise that issue before a reviewing court.").

of words." ***Noffke ex rel. Swenson v. Bakke***, 2009 WI 10, ¶10, 315 Wis. 2d 350, 760 N.W.2d 156. "When a word used in a statute has more than one dictionary definition, 'the applicable definition depends upon the context in which the word is used.'" ***Pierce v. American Fam. Mut. Ins. Co.***, 2007 WI App 152, ¶11, 303 Wis. 2d 726, 736 N.W.2d 247 (quoting ***Kalal***, 271 Wis. 2d 633, ¶49).

¶45 Black's Law Dictionary defines "office," in this context, as: "A place where business is conducted or services are performed.… [A]n office may be a building, a suite of rooms in the building, or an individual room within the building or suite." *Office*, BLACK'S LAW DICTIONARY (11th ed. 2019). Similarly, Merriam-Webster defines "office," in this situation, as "a place where a particular kind of business is transacted or a service is supplied." *Office*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/office (last visited Mar. 29, 2023). These definitions indicate that the common, ordinary, and accepted meaning of the term "office" in this context is a building or a portion of a building where business is conducted or services are performed.

¶46 Amazon Logistics argues that we should broadly interpret the term "office" as including any location where services are performed. Amazon Logistics does not cite to any case law to support this interpretation but, instead, relies on the circuit court's reasoning. Specifically, the circuit court proposed that the word "office" refers to an individual's physical location and is not limited to a static, immovable location.

¶47 The delivery partners' vehicles were, in a broad sense, locations where the delivery partners performed services. But, the context of WIS. STAT. § 108.02(12)(bm)2.b. indicates that the term "office" has a narrower meaning in that statutory subpart than the meaning ascribed by Amazon Logistics. As the

Department points out, the dictionaries referred to above define "office" as a "place." Reasonably considered, the term "place" connotes a fixed physical area or portion of space, not simply one's present location. *See Place*, AMERICAN HERITAGE DICTIONARY, https://www.ahdictionary.com/word/search.html?q=place (last visited Mar. 29, 2023) (defining "place" as "a portion of space."). As well, experience demonstrates that individuals performing services, such as the delivery partners, must do so in some place or location. As a result, if we were to adopt Amazon Logistics' broad interpretation of the term "office" as any location where an individual performs services, then we would be required to conclude that any individual who performs services for an employing unit does so in an "office." Not only is this interpretation of "office" incompatible with the context of § 108.02(12), *see **Pierce***, 303 Wis. 2d 726, ¶11, but it would also render meaningless the "office" criterion set forth under § 108.02(12)(bm)2.b. *See **Belding v. Demoulin***, 2014 WI 8, ¶17, 352 Wis. 2d 359, 843 N.W.2d 373 ("Statutory interpretations that render provisions meaningless should be avoided.").

¶48 Therefore, Amazon Logistics has not demonstrated that the delivery partners maintained their own offices within the meaning of WIS. STAT. § 108.02(12)(bm)2.b.

### 2. The Delivery Partners Performed Most of the Services in a Facility or Location of Their Choosing.

¶49 Our conclusion regarding the delivery partners' purported offices does not end our analysis as to the first element of this factor. As an alternative to the "office" portion of this element, WIS. STAT. § 108.02(12)(bm)2.b. allows a showing that an individual "performs most of the services in a facility or location chosen by the individual." Sec. 108.02(12)(bm)2.b. According to this language, two parts must be shown: (1) the individual performs the services in at least one

facility or location of the individual's choosing; and (2) the services performed at that chosen facility or location constitute "most" of the services performed by the individual. We conclude that Amazon Logistics has satisfied both parts.

### a. The Delivery Partners Chose Some of the Locations Where They Performed Services.

¶50    LIRC's findings of fact indicate that the delivery partners performed services for Amazon Logistics in three distinct locations: (1) the location where the delivery partners picked up packages for delivery and returned undeliverable packages; (2) the route the delivery partners took while driving packages to delivery locations; and (3) the locations where the delivery partners delivered packages to customers. The Department argues that this part of the element is not satisfied because the delivery partners did not choose the pick-up or delivery locations for packages. Amazon Logistics does not dispute that the delivery partners did not have a choice as to where packages were delivered to customers, and that conclusion is supported by the record. Nonetheless, Amazon Logistics argues that the delivery partners chose both the pick-up locations and the routes they took when delivering packages. For the following reasons, we conclude that the delivery partners chose their own routes when delivering packages, but did not choose the pick-up locations.

¶51    As Amazon Logistics asserts, the Agreement permitted the delivery partners to choose their own routes and deliver packages in any order they chose:

> As an independent contractor, subject only to this Agreement, it is for you to decide the means and manner in which to provide the Services and achieve the results that you have agreed to provide. Therefore, in performing Services, you are free to map out your own routes, sequence your deliveries and in every other way control the means and manner in which you deliver [packages].

Consistent with the Agreement, LIRC found that the delivery partners were permitted to choose their own routes when delivering packages: "After scanning the packages, each delivery partner receives through the petitioner's app a suggested delivery route. A delivery partner is free to follow the suggested route or devise [the delivery partner's] own." Based on the terms of the Agreement, there is a sufficient basis in the record for LIRC's finding of fact that the delivery partners chose to either follow the delivery routes suggested by the Flex app or follow their own routes or sequences of deliveries. *See* WIS. STAT. § 108.09(7)(f) (this court may not set aside LIRC's findings of fact unless those findings are "not supported by credible and substantial evidence").[16]

¶52    Regardless, based on two factual premises, the Department argues that the record does not demonstrate that the delivery partners could choose their own routes. First, a former area manager for Amazon Logistics who testified at the hearing in this matter used the term "route" to refer to the rack or collection of packages at the pick-up location. Second, LIRC found that the delivery partners were "seldom able to choose from among the racks to obtain a desirable geographical location" to deliver packages from those racks. From those factual premises, the Department asserts that the delivery partners were not able to select

---

[16] Amazon Logistics also argues that legislative history supports its argument that the delivery partners chose their own delivery routes. Specifically, Amazon Logistics references a report of a committee of the Wisconsin Unemployment Insurance Advisory Council that was prepared in the process of drafting the current version of WIS. STAT. § 108.02(12). *See* Edward Lump, Dennis Penkalski, & Daniel LaRocque, *Report of the Committee to Review the Unemployment Insurance Statutory Definition of "Employee"* (2009). This report states that the language regarding services performed "in a facility or location chosen by the individual" was added to the statute because "[i]ndividuals who decide where to perform the services appear to be no less independent by the fact that they do not maintain their 'own office.'" *Id.* at 28. Although not binding, this report nevertheless confirms our interpretation of § 108.02(12)(bm)2.b. *See **Green Bay Packaging, Inc. v. DILHR***, 72 Wis. 2d 26, 34, 240 N.W.2d 422 (1976) ("The comments of a legislatively created advisory committee are relevant in construing statutes and ascertaining the legislative intent of statutes recommended by that committee.").

their own "routes" for delivering packages. This argument fails. The Department's argument ignores, and cannot be reconciled with, LIRC's material finding of fact and the language of the Agreement already discussed. In addition, it conflates the action of picking up packages with the action of driving those packages to their destinations. The manager's testimony on which the Department relies refers only to picking up packages and does not undermine the undisputed fact that the delivery partners were able to choose their own delivery routes after leaving the warehouse.

¶53    Accordingly, the delivery partners performed services in a location of their choosing when they were driving packages from the pick-up location to those packages' destinations.[17]

¶54    With that, Amazon Logistics has satisfied the second portion of the first element of this factor; that is, whether the delivery partners performed services at a location of their choosing. We next consider whether the delivery partners chose the location where they picked up packages from Amazon Logistics. We do so because it is material to our required analysis in the following section of this opinion concerning the location of "most" of the delivery partners' services.

¶55    Regarding the issue of whether the delivery partners chose the location where they picked up packages, LIRC found that Amazon Logistics offered three delivery programs to the delivery partners during the audit period: "Amazon Logistics" for basic package delivery; "Prime Now" for "ultra-fast" package delivery; and "Amazon Fresh" for grocery delivery. The "Amazon Logistics"

---

[17] Amazon Logistics argues that the Department's assertion that the delivery partners were not able to choose their own routes is an "impermissible post-hoc rationalization of an agency decision." Because we conclude that the delivery partners were permitted to choose their own delivery routes, we need not address this argument. *See Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

program began in early 2016 and operated out of a warehouse in Milwaukee. The "Prime Now" and "Amazon Fresh" programs began in spring 2017 and were located "just a couple suites down" in the same warehouse as the "Amazon Logistics" program. Because all deliveries started at the same warehouse during the audit period, LIRC found that Amazon Logistics "did not have multiple pick-up locations from which the delivery partners could choose."[18] Based on our review of the record, we defer to these findings of fact because they are supported by "credible and substantial evidence." *See* WIS. STAT. § 108.09(7)(f).

¶56 Despite LIRC's material findings of fact, Amazon Logistics argues that the delivery partners were able to choose where to pick up packages. According to Amazon Logistics, when selecting from among available delivery blocks, the delivery partners could choose whether to pick up deliveries "from an Amazon delivery station, [a] grocery store, or Prime Now facility." As we now discuss, this assertion from Amazon Logistics is contrary to LIRC's findings of fact and is not supported by the record.

¶57 In support of its argument, Amazon Logistics cites to the hearing testimony of Neil Loomis, a national program manager for the Amazon Flex program. When asked about the Flex app generally, Loomis stated that the delivery partners were able to see the pick-up location associated with each delivery block and could choose whether to accept a block depending on that location. Loomis confirmed that pick-up locations could vary depending on the type of delivery selected. However, Loomis admitted that he was "not super familiar" with the

---

[18] LIRC also distinguished the facts of the present dispute from the facts of one of its previous decisions involving Amazon Logistics delivery partners. However, LIRC does not identify the decision to which it is referring, and we are unable to find any other publicly available decision from LIRC regarding the delivery partners or Amazon Logistics.

number of logistics stations in the Milwaukee area and had little pertinent "station knowledge" about Milwaukee. Significantly, Loomis stated that deliveries for the "Amazon Logistics" program were picked up at a warehouse in Sussex, Wisconsin, despite the fact that the "Amazon Logistics" program did not move into the Sussex warehouse until after the audit period.[19] Loomis also stated that the delivery partners could choose to pick up deliveries at a Whole Foods location, even though the Whole Foods delivery program did not begin until after the audit period.[20] Because Loomis's testimony relies on facts from outside the audit period, that testimony does not undermine LIRC's finding that Amazon Logistics "did not have multiple pick-up locations from which delivery partners could choose."

¶58 Therefore, the delivery partners were able to perform services in a location of their choosing when driving packages from the warehouse to the packages' destination, but could not choose the pick-up or delivery locations for those packages.

*b. The Delivery Partners Performed Most of Their Services While Driving on Their Selected Delivery Route.*

¶59 The second portion of this element requires that the services performed at the individual's chosen facility or location constituted "most" of the services performed by the individual. WIS. STAT. § 108.02(12)(bm)2.b. Amazon Logistics argues that the delivery partners performed most of their services for

---

[19] The record indicates that the "Amazon Logistics" program moved from the Milwaukee warehouse to the Sussex warehouse in August 2018, after the end of the audit period, and the Prime Now and Amazon Fresh programs remained at the Milwaukee warehouse.

[20] The Whole Foods delivery program began sometime in late 2018 and was not available to the delivery partners during the audit period.

Amazon Logistics while driving on their chosen delivery routes. For the reasons that follow, we agree.

¶60 As LIRC found, delivery blocks were usually "two to four hours in length." When a delivery partner arrived at the pick-up location, the delivery partner drove their vehicle into the warehouse and was directed to an open parking spot next to a rack containing packages. The delivery partner scanned each package on the rack through the Flex app on their smartphone, loaded the packages into their vehicle, and left to deliver the packages. Once at each customer's location, the delivery partner scanned the package again and indicated through the Flex app that the package was delivered. Depending on the circumstances of each case, there may be more than one reasonable manner in which to interpret the standard in this factor regarding "most of the services." In this particular situation, the most reasonable way to interpret that statutory phrase is to consider the delivery partner's actions that took the most amount of time during the delivery blocks. The parties do not proffer a better measure for that determination in light of these facts. As we now discuss, the undisputed facts show that the delivery partners performed most of their services, in terms of time spent, while on routes of their choosing. *See **Gansch v. Nekoosa Papers, Inc.***, 158 Wis. 2d 743, 754, 463 N.W.2d 682 (1990) ("The application [of the statutory test of control to] undisputed facts and undisputed inferences … is … a question of law for the court.").

¶61 The undisputed facts demonstrate that the bulk of each delivery partner's services for Amazon Logistics involved the transportation of packages from the pick-up location to multiple delivery destinations along a route chosen by the delivery partner. There can be no question from this record that the movement of packages from the Amazon Logistics warehouse to the streets outside the places of delivery took up most of the delivery partners' delivery blocks. By contrast, the

delivery partners spent less of their time performing services for Amazon Logistics while loading packages at the pick-up location and placing packages at the doorsteps of the delivery destinations.

¶62    For its part, the Department argues that Amazon Logistics has not satisfied its burden because it is speculative as to the relative amount of time the delivery partners spent transporting and delivering packages. We are not persuaded. In terms of time spent, the only reasonable inference from the undisputed facts is that the delivery partners spent relatively little time loading and unloading packages and spent a relatively longer time driving from the pick-up location to the customers along the delivery partners' chosen routes. In other words, the only reasonable view of the record based on common experience is that the delivery partners did not spend a majority of each two- to four-hour delivery block loading packages at the warehouse, scanning the packages, and placing those packages at customers' doorsteps. The facts already discussed indicate that the delivery partners performed "most" of—*i.e.*, spent most of their time providing—their services while transporting packages to the delivery destinations along their chosen routes. The Department does not point to anything in the record regarding time to refute this reasonable inference.

¶63    Therefore, Amazon Logistics showed that the delivery partners performed most of their services at a facility or location of their choosing.

### 3. The Delivery Partners Used Their Own Equipment or Materials in Performing the Services.

¶64    Next, regarding the second element of this factor, the Department argues that the delivery partners did not use their own equipment or materials in performing delivery services. However, LIRC determined that this element of the

test was met, and LIRC does not adopt this particular argument of the Department regarding this element of WIS. STAT. § 108.02(12)(bm)2.b.

¶65 To repeat, this element requires that an individual "uses [the individuals'] own equipment or materials in performing the services." WIS. STAT. § 108.02(12)(bm)2.b. The plain meaning of this language establishes that, in performing services for an employing unit, an individual must use "equipment or materials" that the individual owns. Of course, the delivery partners performed services for Amazon Logistics by delivering packages to customers from Amazon Logistics' warehouse. In doing so, the delivery partners not only used their own smartphones to interact with the Flex app, but they also used their own vehicles to transport packages from the warehouse to customers.

¶66 The Department asserts that this part of the test is not satisfied because the delivery partners were required to use the Flex app in performing delivery services, and the Flex app did not belong to the delivery partners. WISCONSIN STAT. § 108.02(12)(bm)2.b. does not require that any specific amount of the equipment or materials used in performing the services belong to the individual. In any event, the undisputed facts are that vital and necessary equipment for delivery partners to perform services for Amazon Logistics were a smartphone (in order to interact with the Flex app) and a vehicle (in order to get from the Amazon Logistics warehouse to the customers within the block of time assigned). Thus, because the delivery partners used their own smartphones and vehicles as important equipment in performing delivery services, we conclude that this element of the test is satisfied.[21]

---

[21] On appeal, Amazon Logistics provides a number of alternative grounds for rejecting the Department's argument regarding this element. Because we conclude that the Department's argument fails, we need not address alternative arguments from Amazon Logistics. *See Barrows*, 352 Wis. 2d 436, ¶9.

¶67    In sum, Amazon Logistics proved that the delivery partners performed most of their services in a location of their choosing and that the delivery partners used their own equipment or materials in performing the services.  Therefore, we conclude Amazon Logistics met its burden as to the factor set forth in WIS. STAT. § 108.02(12)(bm)2.b.

**C.  The Record Does Not Establish That Delivery Partners Operated Under Multiple Contracts with One or More Employing Units to Perform Specific Services.**

¶68    The third factor of WIS. STAT. § 108.02(12)(bm)2. requires that "[t]he individual operates under multiple contracts with one or more employing units to perform specific services."  Sec. 108.02(12)(bm)2.c.  LIRC found that Amazon Logistics failed to produce evidence of the "actual existence of multiple contracts." We agree and conclude that Amazon Logistics did not meet its burden as to this factor.

¶69    Amazon Logistics asserts that it produced sufficient evidence that the delivery partners operated under multiple contracts to perform specific services and first points to a portion of the Agreement that permitted the delivery partners to contract with other companies:  "Nothing in this Agreement will prohibit you from providing Services or using your Vehicle on behalf of any other person or entity, including competitors of Amazon, except during any Delivery Block."  As LIRC correctly observed in its decision, this factor contemplates the actual existence of multiple contracts and not merely the ability to enter into such contracts.  *See* WIS. STAT. § 108.02(12)(bm)2.c. (the employing unit must prove that the individual "*operates* under multiple contracts with one or more employing units to perform specific services" (emphasis added)).  Thus, evidence that the delivery partners were

31

merely permitted to enter into contracts with other employing units cannot, by itself, satisfy this factor.

¶70    Amazon Logistics also points to the testimony of a former area manager for its Milwaukee warehouse.  The area manager testified that she had observed signs for other companies such as Uber, Lyft, and GrubHub on the windows of some of the delivery partners' vehicles.  LIRC found as a factual matter that Amazon Logistics failed to prove that the delivery partners operated under contracts with other employing units or under multiple contracts with Amazon Logistics.  Specifically, LIRC found that the testimony of the former area manager regarding the delivery partners' window signs was not supported by credible and substantial evidence because that testimony "was largely based on hearsay, speculation, and conjecture."  Because, under WIS. STAT. § 108.09(7)(f), this court "shall not substitute its judgment for that of the commission as to the weight or credibility of the evidence on any finding of fact," we conclude that LIRC properly determined that the testimony of the former area manager did not satisfy Amazon Logistics' burden as to this factor.

¶71    Amazon Logistics argues that LIRC should not have discounted the testimony of the former area manager as hearsay because that testimony was "highly probative."  It points out that a rule promulgated by the Department regarding the evidence admissible at evidentiary hearings provides that all evidence, including hearsay, is admissible if it has "reasonable probative value."  *See* WIS. ADMIN. CODE § DWD 140.16(1) (May 2019) ("Evidence having reasonable probative value is admissible.  Irrelevant, immaterial and repetitive evidence is not admissible.  Hearsay evidence is admissible if it has reasonable probative value.").  However, that rule does not assist Amazon Logistics here.  LIRC found that the area manager's testimony did not support an inference that numerous delivery partners operated

under contracts for other companies because the testimony had little weight or credibility and, therefore, did not have probative value. We are bound by LIRC's determination in that regard. *See* WIS. STAT. § 108.09(7)(f).

¶72 Amazon Logistics next argues that we should not adhere to LIRC's determination regarding the former area manager's testimony because it would have been "arbitrary and patently unworkable" for Amazon Logistics to produce better evidence. LIRC explained in its decision that the "best and most comprehensive evidence" regarding this issue "would have come directly from the delivery partners themselves" or a stipulation that "one delivery partner's testimony be taken as 'representative' of all the others." According to Amazon Logistics, "[i]t would have been impractical, if not impossible, to subpoena all or even a majority of the 1,000-plus Delivery Partners at issue," especially when the scheduled evidentiary hearing lasted only one day. This argument fails because Amazon Logistics did not raise this concern during the proceedings before the Administrative Law Judge, so the Administrative Law Judge had no opportunity to accommodate Amazon Logistics' evidentiary concerns. Therefore, we conclude that Amazon Logistics forfeited its arguments regarding this issue. ***DOJ v. DWD***, 2015 WI App 22, ¶18, 361 Wis. 2d 196, 861 N.W.2d 789, *aff'd*, 2015 WI 114, 365 Wis. 2d 694, 875 N.W.2d 545 ("[A] party's failure to properly raise an issue before the administrative agency generally forfeits the right to raise that issue before a reviewing court.").

¶73 In sum, we conclude that Amazon Logistics did not meet its burden as to the factor set forth in WIS. STAT. § 108.02(12)(bm)2.c.

**D. The Delivery Partners Incurred the Main Expenses Related to the Services They Performed Under Contract.**

¶74    The fourth factor in WIS. STAT. § 108.02(12)(bm)2. requires that "[t]he individual incurs the main expenses related to the services that [the individual] performs under contract." Sec. 108.02(12)(bm)2.d. LIRC determined that Amazon Logistics met its burden as to this factor. For the following reasons, we agree with that determination.

¶75    As already discussed, the delivery partners required smartphones and vehicles to perform the services, and they incurred the costs of owning and operating their smartphones and vehicles. In its decision, LIRC relied on the terms of the Agreement which state that each delivery partner is responsible for providing and maintaining a smartphone, vehicle, and any other equipment for performing the services. LIRC also relied on a delivery partner's testimony that he used his own smartphone and vehicle to perform services. The delivery partner testified that he was responsible for the costs of his smartphone and vehicle that were associated with his services for Amazon Logistics, including the costs of a mobile data plan, gas, vehicle wear and tear, and automobile insurance. These findings of fact establish that the delivery partners incurred the smartphone and vehicle expenses related to their delivery services under the Agreement. Because these expenses were directly related to, and necessary for, the delivery partners' performance of delivery services, we agree with LIRC that these expenses constituted the "main" expenses.

¶76    On appeal, the Department[22] does not dispute that the delivery partners incurred the expenses related to owning and maintaining their smartphones

---

[22] LIRC concedes on appeal that Amazon Logistics met its burden as to this factor and does not adopt the Department's arguments regarding this factor.

and vehicles. Rather, the Department argues that LIRC should have also considered the expenses incurred by Amazon Logistics and its parent company in running the Flex program, including the costs of creating and maintaining the Flex app, maintaining and staffing warehouses, providing delivery worker support services, and purchasing a commercial insurance policy.[23] We reject the Department's broad argument about expenses related to the general operation of Amazon Logistics.

¶77 This factor does not require proof that the delivery partners incurred *all* expenses in any way related to operating Amazon Logistics. Rather, this factor concerns the "main" expenses for performing *the delivery partners'* services under the contract. *See id.* The use of the word "main" connotes that the expenses relevant to this factor are those that are more important, or more directly related to, the services performed by the individual under the contract. *See Main*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/ main (last visited Mar. 29, 2023) (defining "main" as "larger, more important, or having more influence than others of the same type"); *see also **Varsity Tutors***, 2019 WI App 65, No. 2018AP1951, ¶29 ("LIRC has held that the only expenses relevant to this inquiry are those necessary to perform the actual services of the individual and not those relating to other costs outside of what the individual was contracted to perform."). Here, the expenses incurred by Amazon Logistics in running the Flex program were not as important, or as directly related to, the delivery partners' services as the expenses incurred by the delivery partners in providing and maintaining their own smartphones and vehicles. Therefore, the expenses incurred

---

[23] Amazon Logistics argues that the Department forfeited its arguments as to this factor because it failed to seek judicial review of LIRC's decision. Because we conclude that the Department's arguments on this issue fail on the merits, we need not address whether the Department forfeited its arguments. *See **Barrows***, 352 Wis. 2d 436, ¶9.

in running the Amazon Flex program did not constitute the "main" expenses related to the delivery partners' delivery services under the Agreement.

¶78     The Department also argues that there is not sufficient proof as to this factor because Amazon Logistics did not quantify its expenses or the delivery partners' expenses. We disagree. LIRC found that the delivery partners were responsible for all expenses associated with the services they performed—*i.e.*, the costs associated with the delivery partners' smartphones and vehicles. Based on this fact, LIRC found that it is "obvious" that the expenses borne by the delivery partners in this regard exceeded the expenses borne by Amazon Logistics. We will not disturb LIRC's finding in this regard because it is supported by credible and substantial evidence. *See* WIS. STAT. § 108.09(7)(f).

¶79     In sum, we conclude that Amazon Logistics satisfied the factor set forth in WIS. STAT. § 108.02(12)(bm)2.d.

### E.  The Delivery Partners Were Subject to a Monetary Penalty for Unsatisfactory Work.

¶80     The fifth factor in WIS. STAT. § 108.02(12)(bm)2. requires either one of two elements:  (1) the individual is "obligated to redo unsatisfactory work for no additional compensation"; or (2) the individual is "subject to a monetary penalty for unsatisfactory work."  Sec. 108.02(12)(bm)2.e. (requiring that "[t]he individual is obligated to redo unsatisfactory work for no additional compensation or is subject to a monetary penalty for unsatisfactory work.").  Amazon Logistics argues that it

met its burden as to this factor because the Agreement contains an indemnification provision that subjected delivery partners to such a monetary penalty.[24] We agree.

¶81     The Agreement's indemnification provision states that the delivery partners must:

> defend, indemnify, and hold harmless [Amazon Logistics] from any third-party allegation or claim based on, or any loss, damage, settlement, cost, expense, and any other liability (including reasonable attorneys' fees and expenses) arising out of or in connection with, (a) your negligence, strict liability, or misconduct, (b) a breach of this Agreement by you, (c) any action or inaction by you (including any and all loss or damage to personal property or bodily harm (including death) relating to or arising out of any such action or inaction), or (d) any allegation or claim that you failed to comply with applicable laws, rules, or regulations.

¶82     As discussed, we are not bound by LIRC's conclusions of law and need not grant those conclusions any deference. *See Tetra Tech*, 382 Wis. 2d 496, ¶84.  Nonetheless, we consider LIRC's conclusions about this factor because it informs our analysis.  Prior to this matter, LIRC had consistently concluded that indemnification provisions between an employing unit and an individual similar to the Agreement's indemnification provision satisfied a previous version of this factor which stated:  "The individual is responsible for the satisfactory completion of the services that he or she contracts to perform and is liable for a failure to satisfactorily complete the services."  WIS. STAT. § 108.02(12)(bm)6. (2007-08).  *See, e.g.*, *Bentheimer v. Bankers Life & Cas. Co.*, UI Dec. Hearing No. 10006546JV (LIRC Aug. 16, 2011).  After this factor was amended to its current language, LIRC

---

[24] Amazon Logistics does not assert that the delivery partners are obligated to redo unsatisfactory work for no additional compensation, and we ignore that language regarding this factor.

continued to conclude that an indemnification provision satisfies this factor. *See, e.g.*, *id.*; *Rohland v. Go2 IT Grp.*, UI Dec. Hearing No. 12202959EC (LIRC Feb. 14, 2013).[25]

¶83 In this matter, LIRC arguably departed from its previous interpretation of WIS. STAT. § 108.02(12)(bm)2.e.[26] According to LIRC, an indemnification provision, such as that quoted above from the Agreement, no longer satisfies this factor. Instead, LIRC concluded as a matter of law that an indemnification provision will satisfy this factor only if the provision "speaks to an individual's obligations with respect to unsatisfactory work, including an adverse pecuniary consequence."

¶84 The Department argues that this court should adopt LIRC's interpretation of WIS. STAT. § 108.02(12)(bm)2.e. As an initial matter, we agree with LIRC's general observation that an indemnification provision in a contract will satisfy this factor only if it addresses or "speaks to" an individual's obligations with

---

[25] In *Bentheimer*, the indemnification provision at issue required the individual to "hold harmless and indemnify Bankers Life from and against any claims, demands, penalties, suits or actions, and from all losses, costs, and expenses arising from her default in performance or the negligent performance of her services." *Bentheimer v. Bankers Life & Cas. Co.*, UI Dec. Hearing No. 10006546JV (LIRC Aug. 16, 2011).

LIRC also addressed the new version of this factor in *Bentheimer*. There, LIRC conducted a statutory interpretation of the new language and determined that the individual was subject to a monetary penalty by agreeing to indemnify Bankers Life. In the present matter, LIRC did not address, or even recognize, its previous decisions in *Bentheimer* and *Rohland* that an indemnification provision satisfies the latest version of the statute.

[26] On appeal, Amazon Logistics contends that it was deprived of due process because LIRC abandoned its prior interpretation of this factor and then faulted Amazon Logistics for not producing evidence to meet its new interpretation. Because we conclude that the indemnification provision satisfies this factor, we need not address whether Amazon Logistics was deprived of due process in this regard. *Barrows*, 352 Wis. 2d 436, ¶9.

respect to unsatisfactory work. However, an indemnification provision is not required to contain the phrase "unsatisfactory work" or any other particular set of words to satisfy this factor. Rather, the provision must be analyzed to determine whether it subjects the individual to a monetary penalty for unsatisfactory work. For the following reasons, we conclude that the indemnification provision in the Agreement satisfies this factor.[27]

### 1. The Indemnification Provision Addresses "Unsatisfactory Work."

¶85 First, the indemnification provision addresses "unsatisfactory work." LIRC concluded that the indemnification provision does not address the delivery partners' obligations with respect to unsatisfactory work because it "does not specifically address what happens when a delivery partner fails to achieve the results he [or she] agreed to provide—the timely and effective delivery of undamaged parcels, bags, totes or other items to the customers' and [Amazon Logistics'] satisfaction." In effect, LIRC interprets the phrase "unsatisfactory work" as referring only to a delivery partner's breach of the "Service Standards" set forth in the Agreement which include, but are not limited to, reliability, delivery quality, and customer service.

¶86 LIRC erred because its interpretation of the phrase "unsatisfactory work" is too narrow in these circumstances. Although the word "work" is not defined in WIS. STAT. ch. 108, the ordinary meaning of the word "work" in this context refers to any physical or mental exertion pursued by the individual primarily

---

[27] The Department argues that we must liberally construe this factor in favor of employee status. As explained above, we will not liberally construe a statute unless there is some ambiguity to construe. **DOJ v. DWD**, 2015 WI 114, ¶32, 365 Wis. 2d 694, 875 N.W.2d 545. Because the Department does not argue that any part of this factor is ambiguous, we need not take up the question of liberal construction.

for the benefit of the employing unit. *See Work*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "work" as "[p]hysical and mental exertion to attain an end, esp[ecially] as controlled by and for the benefit of an employer; labor."); *cf. **Olson v. Auto Sport, Inc.**, 2002 WI App 206, ¶¶16-17, 257 Wis. 2d 298, 651 N.W.2d 328 (adopting the Black's Law Dictionary definition of "work" in the context of Wisconsin's child labor statutes under WIS. STAT. ch. 103); WIS. ADMIN. CODE § DWD 272.12(1)(a)1. (Feb. 2023) (defining "hours worked" in the context of Wisconsin's minimum wage law as "all time spent in physical or mental exertion … controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer's business." (internal quotation marks omitted)).

¶87 The Agreement sets forth "work" obligations of the delivery partners not only by describing the "Service Standards" that the delivery partners must follow but also by describing in the indemnification provision conduct that triggers the delivery partners' obligation to defend and indemnify Amazon Logistics. As noted, such conduct includes, but is not limited to, the delivery partners' negligence, "misconduct," breach of the agreement, and "action and inaction" causing personal property damage. Neither LIRC's conclusion about this factor nor the Department's arguments on appeal explain why the delivery partners' "work" obligations must have been limited to the "Service Standards" set forth in the Agreement. Just as importantly, the obligations placed on the delivery partners in the Agreement's indemnification provision also set forth actions and inactions that reasonably come within the definition of "unsatisfactory work." Thus, we conclude that the indemnification provision required the delivery partners to defend and indemnify Amazon Logistics when they provided "unsatisfactory work."

## 2. The Obligation to Defend and Indemnify is a "Monetary Penalty."

¶88     Second, the indemnification provision subjected the delivery partners to a "monetary penalty."   LIRC did not address whether the indemnification provision subjected the delivery partners to a "monetary penalty" and addressed only the penalty associated with violations of the "Service Standards."  In doing so, LIRC concluded that the delivery partners were not subject to a monetary penalty because the sole penalty set forth in the Agreement for violating the Service Standards was ineligibility to continue participation in the Flex program.  However, as Amazon Logistics correctly observes, the Agreement contains more than one penalty for unsatisfactory work.   Specifically, delivery partners who provide unsatisfactory work are subject not only to the revocation of their eligibility to participate in the program, but also to the monetary obligations to defend and indemnify Amazon Logistics.

¶89     On appeal, the Department attempts to address this gap in LIRC's decision.  The Department argues that the phrase "monetary penalty" should be interpreted solely as an individual forfeiting a fixed sum of money for unsatisfactory work.

¶90     We do not agree with the Department's interpretation of the phrase "monetary penalty" as used in this factor.  Here, the phrase is used to describe the consequence an individual faces for "unsatisfactory work."   *See* WIS. STAT. § 108.02(12)(bm)2.e.  By interpreting the word "monetary penalty" as referring only to a sum fixed in the Agreement, the Department attempts to narrow the phrase "monetary penalty" inconsistent with a reasonable interpretation of the plain language of this factor.

¶91 Instead, the context in which the phrase "monetary penalty" is used indicates that this phrase broadly refers to any monetary punishment or disadvantage that stems from an individual's failure to perform satisfactory work for the employing unit. *See Penalty*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "penalty," in part, as a "[p]unishment imposed on a wrongdoer"); *Penalty*, CAMBRIDGE DICTIONARY, dictionary.cambridge.org/us/dictionary/ english/penalty (Last visited Mar. 29, 2023) (defining "penalty," in part, as "a disadvantage brought about as a result of a situation or action"). The indemnification provision imposed a monetary punishment or disadvantage by requiring delivery partners to expend money to defend and indemnify Amazon Logistics if they provided unsatisfactory work in certain regards. Thus, the indemnification provision subjected the delivery partners to a "monetary penalty" for unsatisfactory work.

### 3. The Delivery Partners Were Subjected to a Monetary Penalty for Unsatisfactory Work.

¶92 LIRC concluded that Amazon Logistics did not satisfy this factor because there was no evidence that Amazon Logistics ever enforced the indemnification provision. *See* WIS. STAT. § 108.02(12)(bm) (requiring proof of each factor "by contract and in fact"). The Department argues that we should adopt LIRC's determination.

¶93 We conclude that LIRC misinterpreted this factor. As will be discussed further in this opinion with respect to other factors under WIS. STAT. § 108.02(12)(bm)2., the language of § 108.02(12)(bm)2.e. may be satisfied by proof of the contractual obligation alone. To repeat, this factor requires, in pertinent part, that the individual is "*subject* to a monetary penalty for unsatisfactory work." Sec. 108.02(12)(bm)2.e. (emphasis added). Reasonably interpreted, the term "subject" in this context means that delivery partners were "exposed" to the

possibility that they would be obligated to pay a monetary penalty for unsatisfactory work. *See Subject*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "subject" as "[e]xposed, liable, or prone"); *Subject*, MERRIAM-WEBSTER DICTIONARY, www.merriam-webster.com/dictionary/subject (Last visited Mar. 29, 2023) (defining "subject" as "suffering a particular liability or exposure"). Here, LIRC impermissibly added to this factor the requirement that Amazon Logistics show that the monetary penalty was actually enforced against delivery partners. *See State v. Neill*, 2020 WI 15, ¶23, 390 Wis. 2d 248, 938 N.W.2d 521 ("[C]ourts [and administrative agencies] should not add words to a statute to give it a certain meaning." (citation omitted)). Thus, an employing unit can prove this element of the factor through the contractual obligations alone.[28]

¶94 In this matter, Amazon Logistics established that the Agreement obligated all delivery partners to defend and indemnify Amazon Logistics for any costs or expenses arising from, among other things, the delivery partners' negligence, misconduct, breach of the agreement, and actions or inactions causing property damage. Thus, pursuant to this indemnification provision, the delivery partners were subject to a monetary penalty for unsatisfactory work. In sum, we conclude that Amazon Logistics has satisfied the factor set forth in WIS. STAT. § 108.02(12)(bm)2.e.

---

[28] To confirm our analysis of this point, we note that a prior version of WIS. STAT. § 108.02(12)(bm) also required this factor to be proved "by contract and in fact." *See* Sec. 108.02(12)(bm)6. (2007-08). In *Bentheimer*, LIRC analyzed this prior version and concluded that an indemnification provision satisfied that version of this factor even though there was no evidence that the provision was ever enforced. *Bentheimer*, UI Dec. Hearing No. 10006546JV. As discussed in ¶82, above, *Bentheimer* also concluded that an indemnification provision similar to that in the Agreement satisfied the current version of this factor.

### F. The Services Performed by the Delivery Partners Directly Related to Amazon Logistics.

¶95     The sixth factor of WIS. STAT. § 108.02(12)(bm)2. requires that "[t]he services performed by the individual do not directly relate to the employing unit retaining the services."  Sec. 108.02(12)(bm)2.f.  LIRC concluded that Amazon Logistics did not meet its burden as to this factor because the delivery partners' services directly related to Amazon Logistics' business.  We agree.

¶96     In *Keeler*, this court explained that this factor focuses on whether the individual's services are "integrated" into the employing unit's business.  *Keeler*, 154 Wis. 2d at 633 (citing WIS. STAT. § 108.02(12)(b)2. (1989-90)).[29]  *Keeler* illustrated this concept with the example of a tinsmith who is called upon to repair a company's rain gutters when the company is engaged in a business unrelated to the repair or manufacture of gutters.  *Id.*  This court explained that "the services performed by the tinsmith do not directly relate to the activities conducted by the company retaining these services" because "the tinsmith's activities are totally unrelated to the business activity conducted by the company retaining his services." *Id.*

¶97     Here, the delivery partners' services were integrated into and directly related to Amazon Logistics' business.  As LIRC found, Amazon Logistics' "core purpose" is "to ensure that Amazon's products get into the hands of its customers as quickly and efficiently as possible."  To that end, Amazon Logistics secured not

---

[29] As explained earlier, *Keeler v. LIRC*, 154 Wis. 2d 626, 453 N.W.2d 902 (Ct. App. 1990), analyzed a former version of WIS. STAT. § 108.02(12) that did not include the current nine-factor test of § 108.02(12)(bm)2.  Nevertheless, *Keeler*'s discussion of integration is helpful in interpreting the current language of § 108.02(12)(bm)2.f.  *See* Lump, et al., *supra* at 30-31 (explaining that *Keeler*'s "integration" analysis was one of the bases for the current language of § 108.02(12)(bm)2.f.).

only the delivery services of FedEx, UPS, and the United States Postal Service—all "independently established businesses [and a government entity] with their own employees"—but also secured the services of the delivery partners "when it deems it beneficial or necessary to do so." Further, LIRC found that Amazon Logistics "provides its delivery partners with its proprietary smartphone app, assists them with mapping, and gives them access to its customer support teams." Unlike the hypothetical tinsmith in *Keeler*, the services provided by the delivery partners were integrated and interwoven into Amazon Logistics' business of quickly and efficiently shipping Amazon.com's products to Amazon.com customers.[30]

¶98     Amazon Logistics asserts that the delivery partners' services did not directly relate to its business because the "fundamental nature" of its business is logistics, not delivery. Amazon Logistics further asserts that it "does not engage in delivery services itself" but, rather, "coordinates and arranges for the delivery of products to Amazon.com customers via contracts with a variety of delivery service providers." Amazon Logistics contends that the delivery partners' services "merely … assist with the coordination of the distribution of products sold on Amazon.com."

¶99     We are not persuaded by Amazon Logistics' assertion. As explained, we defer to LIRC's findings of fact, including its pertinent finding that Amazon Logistics' core purpose is "to ensure that Amazon's products get into the hands of its customers as quickly and efficiently as possible." *See* WIS. STAT. § 108.09(7)(c)1.   Amazon Logistics' business activities involve not only coordinating product deliveries, but also engaging in delivery services. Amazon Logistics created the Flex Program, created and maintained the Flex app used by

---

[30] The parties do not dispute that Amazon Logistics is a wholly-owned subsidiary of Amazon.com.

the delivery partners, developed a mapping function to optimize the delivery of products, provided training videos to the delivery partners on how to navigate and use the Flex app, and provided a customer support team to assist the delivery partners with software and package handling issues. These facts demonstrate that the delivery partners' services were integrated into Amazon Logistics' business.

¶100 Amazon Logistics next argues that it met its burden as to this factor because it showed that the delivery partners' services were analogous to the services provided by the individuals in *Ebenhoe* and *Varsity Tutors*. As discussed earlier, in *Ebenhoe*, LIRC determined that a Lyft driver satisfied this factor because Lyft is not a "provider of transportation services" but, instead, is a "transportation network company" that provides "technology services utilized in the transportation industry." *Ebenhoe*, UI Dec. Hearing No. 16002409 MD. Similarly, in *Varsity Tutors*, this court concluded that this factor was satisfied because Varsity Tutors "does not provide any tutoring services" but, instead, "connects students who want tutoring with people who want to provide tutoring services." *Varsity Tutors*, 2019 WI App 65, No. 2018AP1951, ¶33. In contrast, Amazon Logistics is not like Lyft or Varsity Tutors because it is not a digital platform connecting providers of services with a class of customers interested in those services. Amazon Logistics is directly involved in the business of delivering products to Amazon.com customers, and it used the services of the delivery partners to achieve that objective.

¶101 In sum, we conclude that Amazon Logistics did not meet its burden as to the factor set forth in WIS. STAT. § 108.02(12)(bm)2.f.

### G. The Delivery Partners May Have Realized a Profit or Suffered a Loss Under the Agreement.

¶102  The seventh factor of WIS. STAT. § 108.02(12)(bm)2. requires that "[t]he individual may realize a profit or suffer a loss under contracts to perform such services."  Sec. 108.02(12)(bm)2.g.  We begin by considering the meaning of that language.  *See **Brey v. State Farm Mut. Auto. Ins. Co.***, 2022 WI 7, ¶11, 400 Wis. 2d 417, 970 N.W.2d 1 ("[T]he ascertainment of meaning involves a 'process of analysis' focused on deriving the fair meaning of the text itself." (quoting ***Kalal***, 271 Wis. 2d 633, ¶46)).

¶103  First, in this context, the parties do not dispute that individuals realize a "profit" when their income exceeds their expenses under the contract to perform services, and individuals suffer a "loss" when their expenses exceed their income under the contract.

¶104  Second, Amazon Logistics contends that the use of the word "may" in this factor requires only a "possibility" that a delivery partner could realize a profit or suffer a loss.  The Department responds that Amazon Logistics' interpretation of the word "may" renders this factor meaningless because a mere possibility of profit or loss could always be satisfied as "it is always possible a worker could lose money." (Emphasis omitted.)  The Department asserts that the proper test is whether the individual faces a "realistic possibility of loss," not whether, "given the universe of possibilities, something could occur that could result in a loss."

¶105  We recognize that the ordinary meaning of the word "may" presents some difficulties in interpreting WIS. STAT. § 108.02(12)(bm)2.g.  As defined in the dictionary, the word "may" means "[t]o be a possibility."  *May*, BLACK'S LAW

DICTIONARY (11th ed. 2019); *see also **Dane Cnty. v. Kelly M.***, 2011 WI App 69, ¶24, 333 Wis. 2d 719, 798 N.W.2d 697 (defining "may" as "in some degree likely to"). Because the word "may" in § 108.02(12)(bm)2.g. is not modified by language expressing a particular degree of possibility or likelihood, this factor could be read as being satisfied by any possibility of an individual realizing a profit or suffering a loss. However, when applied in the context of this factor, the dictionary definition of the word "may" leads to unreasonable results. This factor would then be satisfied in nearly every instance because there will almost always be at least a slim possibility that the individual would, or would not, earn enough income to cover their contractually-related expenses. Thus, using the common definition of the word "may," § 108.02(12)(bm)2.g. would have no value in determining whether an individual is an "employee." We will not adopt an interpretation that leads to such unreasonable results and cannot be the meaning intended by the legislature. ***State v. Matasek***, 2014 WI 27, ¶13, 353 Wis. 2d 601, 846 N.W.2d 811 ("[W]ords are given meaning to avoid absurd, unreasonable, or implausible results and results that are clearly at odds with the legislature's purpose.").

¶106 To help guide our interpretation of this statutory subpart, we may consider LIRC's decisions regarding this factor. In interpreting WIS. STAT. § 108.02(12)(bm)2.g., LIRC has concluded that the employing unit must show that the individual has incurred a "realistic" risk of loss "over the course of the contract" to perform services. *See, e.g.*, ***Alsheski v. Codeworks, Inc.***, UI Dec. Hearing No. 09403672AP (LIRC Feb. 26, 2010) ("The test is whether, over the course of the

contract between [the individual] and [the employing unit], there was a realistic possibility that [the individual] could realize a profit or suffer a loss.").[31]

¶107 This is a reasonable interpretation of the word "may" in this context. Accordingly, we conclude that the proper test for determining whether individuals may realize a profit or suffer a loss under a contract to perform services is whether, over the course of the contract, there is a genuine or realistic possibility that the individuals will have their income exceed their expenses or will incur more expenses than they earn in income. LIRC determined that Amazon Logistics did not meet its burden as to this factor because the delivery partners could neither "realize a profit" nor "suffer a loss." We disagree.

¶108 We address the two elements of "realize a profit" and "suffer a loss" in turn.

### 1. The Delivery Partners May Have Realized a Profit.

¶109 LIRC concluded that the delivery partners could not realize a profit because: Amazon Logistics "unilaterally determined the service fee to be paid for each block"; Amazon Logistics did not allow the delivery partners to negotiate their compensation; the delivery partners could not receive more than the service fee for a particular block; and the delivery partners could not accept multiple blocks at once.

¶110 On appeal, the Department argues that the delivery partners may not have realized a profit because they could not, "by their own initiative, increase the amount they earn." In response, Amazon Logistics argues that the delivery partners

---

[31] In *Alsheski v. Codeworks, Inc.*, UI Dec. Hearing No. 09403672AP (LIRC Feb. 26, 2010), LIRC analyzed a prior version of WIS. STAT. § 108.02(12) that contained a factor with language identical to the current factor. *See* § 108.02(12)(b)2.f. (2007-08).

may have realized a profit because they could increase the amount they earn by accepting blocks with higher fees, by accepting tip-eligible blocks, and by using more fuel-efficient vehicles.

¶111   We conclude that Amazon Logistics met its burden as to this element of WIS. STAT. § 108.023(12)(bm)2.g., but not based on the considerations discussed by LIRC or the parties.  The considerations of LIRC and the parties address only whether the delivery partners may have earned more than the service fee provided for each delivery block when each block is viewed in isolation.  These arguments miss the mark.

¶112   In this context, the "income" that the delivery partners received under the contract was the service fee associated with delivery blocks they accepted, and the "expenses" that the delivery partners incurred were the costs that the delivery partners paid in order to perform the services under the contract, such as smartphone and vehicle expenses.  Importantly, the parties do not dispute that the service fees earned by the delivery partners could—and often did—exceed the expenses incurred in performing the services over the course of the acceptance of multiple delivery blocks.  Two points confirm that conclusion, and the Department gives no basis to question these points.  LIRC found that "the only delivery partner who testified in this matter had never lost money on a delivery block" and, if that was true for each block, it necessarily follows that must also be true for multiple delivery blocks.  Further, experience teaches that, if individuals cannot make a profit in a business endeavor, it is highly likely that those individuals will leave that endeavor.  Yet, the Flex program continued for at least the time of the audit with about one thousand participants.  If delivery partners could not turn a profit in doing this work, the Flex program would likely have collapsed quickly from a lack of participants.  Therefore, during the time period in dispute and based on the undisputed facts, the delivery

partners may have "realized a profit" under the contract to perform services for Amazon Logistics.

## 2. The Delivery Partners May Have Suffered a Loss.

¶113  Next, and somewhat surprisingly in light of its determination that the delivery partners did not have a realistic possibility of realizing a profit, LIRC also concluded that the delivery partners did not have a realistic possibility of suffering a loss.  LIRC determined that there was "no realistic possibility" of losing money under the Agreement because the delivery partners incurred predictable expenses and received fixed amounts of income for each delivery block.  For this conclusion, LIRC relied on the delivery partner's testimony that he had never lost money on a delivery block.  On appeal, Amazon Logistics argues that the delivery partners had a realistic possibility of suffering a loss because their expenses incurred in completing delivery blocks could have exceeded the income they received for performing those services.

¶114  Depending on the facts of the case, there may be more than one reasonable method of measuring whether an individual faces a "realistic" possibility of suffering a loss over the course of a contract to perform services.  One method that LIRC has articulated is whether the individual's incurred expenses or earned income under the contract are sufficiently unpredictable such that the individual faces a genuine risk that his or her expenses will exceed his or her income.  *See, e.g.*, ***Dane Cnty. Hockey Offs. Ass'n***, UI Dec. Hearing No. S9800101MD (LIRC Feb. 22, 2000) (stating that those individuals did not face a "genuine risk of loss" because they had "fixed, predictable expenses of employment" that were "more than

offset by the income they can earn through employment.").[32] We conclude that this method of measuring an individual's realistic risk of loss over the course of the contract is a workable test under the specific facts of the present case.[33]

¶115 Applying this test to the facts of the present matter, we conclude based on the undisputed facts that Amazon Logistics has satisfied this element. As LIRC found, the delivery partners were paid $36 for two-hour delivery blocks and $72 for four-hour delivery blocks. The delivery partners were also responsible for providing and maintaining their smartphones, vehicles, and any other equipment they wished to use in providing the services. The delivery partner who testified stated that he was responsible for paying the expenses related to performing delivery services, such as the costs of "gas, vehicle wear and tear, auto insurance, and data for his smartphone." In fact, the Agreement recognized that a delivery partner may incur expenses such as the cost of fuel, taxes, registration fees, permits of all types, and any other fees assessed against the delivery partner's vehicle.

¶116 The delivery partners received a predictable amount of income for completing delivery blocks, but the delivery partners' expenses were not sufficiently predictable so as to eliminate a realistic or genuine risk of loss over the course of the Agreement. In particular, the delivery partners' expenses related to fuel and vehicle maintenance were not fixed or easily predictable. For instance, a delivery

---

[32] In ***Dane County Hockey Officials Ass'n***, UI Dec. Hearing No. S9800101MD (LIRC Feb. 22, 2000), LIRC analyzed a prior version of WIS. STAT. § 108.02(12) that contained a factor with language identical to the current factor. *See* WIS. STAT. § 108.02(12)(b)2.f. (1995-96).

[33] We emphasize that the "unpredictability" test may not be the only way to measure an individual's risk of loss, nor is it necessarily applicable under every set of facts. In the present matter, LIRC discussed in its decision whether the delivery partners assumed the "entrepreneurial risks" of a "business undertaking." Because our discussion of the "unpredictability" test is dispositive as to the facts of the present matter, we do not express any opinion as to whether LIRC's "entrepreneurial risks" test can be a valid interpretation of WIS. STAT. § 108.02(12)(bm)2.g.

partner's vehicle could incur heavy wear and tear, unexpectedly break down, or be inadvertently damaged while the delivery partner delivered packages during a delivery block. In any of these realistic scenarios, the delivery partner was responsible for hundreds, if not thousands, of dollars in repairs to the vehicle in addition to the other vehicular and cellular phone expenses incurred under the Agreement. Even if the delivery partner completed multiple delivery blocks, the delivery partner may not have earned enough income to fully cover the expenses incurred in these scenarios.

¶117 The Department argues that the delivery partners did not face a realistic possibility of loss because they used their personal smartphones and vehicles and were not required to purchase equipment that they would use only when performing services for Amazon Logistics. We are not persuaded. Even if it is assumed that all delivery partners purchased their smartphones and vehicles for personal use prior to joining the Flex program, the Department does not explain how that assumption excludes the delivery partners' vehicular and cellular phone expenses from consideration under this test. As explained, the delivery partners needed smartphones and vehicles to perform services under the contract, and they were responsible for the expenses incurred when using that equipment to perform those services. Thus, the delivery partners had a realistic possibility of suffering a loss while performing services under the contract even if they did not initially invest in their equipment for the sole purpose of providing services for Amazon Logistics.

¶118 The Department also argues that Amazon Logistics did not meet its burden as to this element because it did not present any "direct evidence … of actual losses" suffered by the delivery partners but, instead, presented only "speculation" that certain events could have caused the delivery partners to suffer a loss. However, as discussed, the use of the word "may" in this test means that the employing unit

need only prove that there was a realistic possibility of suffering a loss under the contract to perform services. As a result, this element can be satisfied by proof of reasonable scenarios and contractual obligations alone.

¶119 In sum, we conclude that Amazon Logistics met its burden as to the factor set forth in WIS. STAT. § 108.02(12)(bm)2.g.

**H. The Delivery Partners Had Recurring Business Liabilities or Obligations.**

¶120 The eighth factor of WIS. STAT. § 108.02(12)(bm)2. requires that "[t]he individual has recurring business liabilities or obligations." Sec. 108.02(12)(bm)2.h. Amazon Logistics argues that it met its burden as to this factor because the Agreement required that the delivery partners pay the recurring costs of maintaining a smartphone and a vehicle. The Department responds that the delivery partners' recurring smartphone and vehicle expenses do not satisfy this factor because those obligations were not incurred solely for business purposes. We agree with Amazon Logistics.

¶121 We begin by setting forth the proper interpretation of this factor.

### 1. Recurring Business Liabilities or Obligations Need Not Be Incurred Solely for Business Purposes.

¶122 The Department argues that we should adopt LIRC's interpretation of this factor. In this case and prior LIRC decisions, LIRC determined that recurring expenses will qualify as "business liabilities or obligations" under this factor only if those expenses are "for business purposes alone." According to LIRC, expenses that are incurred for both personal and business purposes do not satisfy this factor. *See, e.g.*, **Castforce Inc.**, UI Dec. Hearing No. S1300154MW (LIRC Sept. 8, 2014) (determining that the individual's expenses for cellular service, automobile

insurance, and automobile maintenance did not satisfy this factor because those were incurred for both personal and business purposes); *Martin v. Madison Newspapers Inc.*, UI Dec. Hearing No. 13001922MD (LIRC Oct. 10, 2013) (determining that the individual's expenses of maintaining an internet services provider and a cell phone provider did not satisfy this factor because those were incurred for both personal and business purposes).

¶123 We conclude that LIRC's interpretation of WIS. STAT. § 108.02(12)(bm)2.h. must be rejected because it is too narrow. According to the plain meaning of this factor, the employing unit must establish three points: (1) the individual has a liability or obligation; (2) that liability or obligation is incurred as a part of the individual's "business"; and (3) that liability or obligation is "recurring." Sec. 108.02(12)(bm)2.h. Nothing in the text of this factor indicates that the individual's recurring liability or obligation must be incurred for business purposes alone. Rather, this factor may be satisfied even if the recurring business liability or obligation is also incurred for personal purposes.[34]

¶124 Our interpretation of this factor is consistent with decisions from this court and LIRC. In *Varsity Tutors*, this court concluded that this factor was satisfied

---

[34] Additionally, in this matter and in some prior decisions, LIRC has interpreted this factor as requiring "a cost of doing business that the individual would incur even during a period of time when he [or she] was not performing work for the employing unit, such as expenses for office rent, liability insurance, continuing education, membership dues, and professional or license fees." *See, e.g.*, *Schumacher v. Spar Mktg. Servs. Inc.*, UI Dec. Hearing No. 11203182EC (LIRC Mar. 21, 2012) (explaining that this requirement refers to "overhead expenses that cannot be avoided by ceasing to perform services"). This requirement created by LIRC is also untethered to the text of WIS. STAT. § 108.02(12)(bm)2.h. Nothing in the language of this factor indicates that it is limited to "overhead expenses" or other expenses that are incurred when the individual is not performing services for an employing unit. Instead, as we explain, a recurring liability or obligation will satisfy this factor if it is reasonably related to the individual's business.

because an individual's contract with Varsity Tutors required her to maintain a specific level of automobile insurance. *Varsity Tutors*, 2019 WI App 65, No. 2018AP1951, ¶¶36-37. In doing so, this court rejected LIRC's argument that the individual's automobile insurance did not satisfy this factor if it was initially purchased for personal purposes. *Id.* Additionally, LIRC has determined that this factor was satisfied because the individual was required to maintain liability insurance and automobile insurance. *Quality Commc'ns Specialists Inc.*, Hearing Nos. S0000094MW, S0000095MW (LIRC July 30, 2001).[35] In that matter, LIRC did not question whether those expenses were initially incurred for personal or business purposes. *Id.* Instead, LIRC determined that "[t]he recurring obligation to pay premiums for insurance which must be maintained in order for the individual to be able to perform their services under contract" was, by itself, sufficient to satisfy this factor. *Id.*

¶125 The Department argues that the interpretation of this factor we have adopted is incorrect because it would cause this factor to be "duplicative" of the factor that asks whether the individual "incurs the main expenses related to the services that he or she performs under contract." *See* WIS. STAT. § 108.02(12)(bm)2.d. We disagree. As noted, factor 2.d. is concerned with "the main expenses related to the services," while factor 2.h. is concerned with "recurring business liabilities or obligations." Although these concepts may overlap at times, each factor addresses a distinct aspect of an individual's performance of services. For instance, factor 2.h. broadly applies to the individual's "business"— including the individual's services for more than one employing unit—whereas

---

[35] In *Quality Communications Specialists Inc.*, Hearing Nos. S0000094MW, S0000095MW (LIRC July 30, 2001), LIRC analyzed a prior version of WIS. STAT. § 108.02(12) that contained a factor with language identical to the current factor. *See* § 108.02(12)(b)2.g. (1999-2000).

factor 2.d. only looks at the services the individual performs under the contract with one particular employing unit. Additionally, factor 2.h. looks at all recurring expenses related to the individual's "business," whereas factor 2.d. only looks at the "main" expenses related to the individual's services performed under the contract with the employing unit. Finally, factor 2.h. requires the individual's liabilities or obligations to be "recurring," whereas factor 2.d. may, in some circumstances, be satisfied by a one-time expense. Thus, our interpretation of factor 2.h. gives that factor a separate meaning from factor 2.d.

¶126 The Department next contends that our interpretation of this factor is incorrect because it renders the word "business" meaningless. According to the Department, if the factor is interpreted to include costs associated with personal uses, the factor would be meaningless because "any Wisconsin driver will have auto insurance and most individuals have cell phones." We are not persuaded. As we explained, this factor requires that the individual's recurring liabilities or obligations are incurred as a part of the individual's "business." If the individual has recurring insurance and cell phone obligations as a part of his or her business, then those obligations will satisfy this factor. If those recurring obligations are incurred solely for personal use, however, then those will not satisfy this factor. Therefore, our interpretation of this factor does not render any statutory language meaningless.

¶127 Next, the Department argues that we should "reconsider" our decision in *Varsity Tutors* because, according to the Department, *Varsity Tutors* misinterpreted LIRC's conclusion in *Quality Communications*. This argument fails because the Department is essentially asking us to overrule the *Varsity Tutors* opinion. Only our supreme court has the authority to overrule a previous opinion of the court of appeals. *Cook v. Cook*, 208 Wis. 2d 166, 190, 560 N.W.2d 246 (1997).

¶128 The Department further appears to contend that the doctrine of "legislative acquiescence" requires that we adopt its interpretation of this factor. The doctrine provides that "legislative silence following judicial interpretation of a statute demonstrates legislative acquiescence in that interpretation." *Wenke v. Gehl Co.*, 2004 WI 103, ¶31, 274 Wis. 2d 220, 682 N.W.2d 405. This doctrine is premised on the presumptions that the legislature acts with knowledge of a court's binding interpretation of a statute and recognizes that, if it does not explicitly change the law, the court's binding interpretation will remain unchanged. *State ex rel. Campbell v. Township of Delavan*, 210 Wis. 2d 239, 256, 565 N.W.2d 209 (Ct. App. 1997). Our supreme court has emphasized that this doctrine is not conclusive of the legislature's intent, but "is merely a presumption to aid in statutory construction." *Wenke*, 274 Wis. 2d 220, ¶35; *see also* *Green Bay Packaging, Inc. v. DILHR*, 72 Wis. 2d 26, 35, 240 N.W.2d 422 (1976) ("[L]egislative inaction following an interpretation of a statute by this court … is to be considered as evidence that the legislature agrees with that interpretation, but not as raising a conclusive presumption of tacit adoption and ratification by the legislature.").

¶129 In the present matter, the Department asserts that the legislature implicitly approved of LIRC's interpretation of WIS. STAT. § 108.02(12)(bm)2.h. now espoused in this appeal when the legislature amended § 108.02(12) in 2010 without altering the language of that subpart. *See* 2009 Wis. Act 287, § 8. The Department does not point to any specific LIRC decision on which the legislature purportedly relied. Rather, it states that the legislature was aware of LIRC's interpretation of this factor based on the report of the advisory committee that recommended the 2010 amendments to § 108.02(12). *See* Edward Lump, Dennis

Penkalski, & Daniel LaRocque, *Report of the Committee to Review the Unemployment Insurance Statutory Definition of "Employee"* 31 (2009).[36]

¶130  We conclude that the doctrine of legislative acquiescence does not require us to adopt LIRC's current interpretation of WIS. STAT. § 108.02(12)(bm)2.h.  As explained, this doctrine is merely a presumption to aid in statutory construction and does not, by itself, require any court to adopt any particular statutory interpretation.  *Wenke*, 274 Wis. 2d 220, ¶35.  Second, and more importantly, the doctrine of legislative acquiescence does not apply to a Wisconsin administrative agency's interpretation of a statute.  As noted, the underpinning of this doctrine is the presumption that the legislature knows that a particular statutory interpretation is binding and, thus, recognizes that its inaction will leave that interpretation intact.  *Campbell*, 210 Wis. 2d at 256.  However, as explained earlier in this opinion, a Wisconsin administrative agency's interpretation of a statute is not binding on any court of this state.  *See **Tetra Tech***, 382 Wis. 2d 496, ¶108.  Accordingly, there is no basis for us to presume that the legislature recognized that its inaction would leave LIRC's interpretation intact.  *See **State ex rel. Angela M.W. v. Kruzicki***, 209 Wis. 2d 112, 125, 561 N.W.2d 729 (1997) ("[T]he doctrine presupposes the existence of a decision which … is not subject to further appellate review.").  Therefore, we will not presume that the legislature was aware of LIRC's

---

[36] The committee report on which the Department relies does not alter our discussion immediately below.  The report states that the committee declined to recommend any changes to WIS. STAT. § 108.02(12)(bm)2.h. because that factor "is a useful element in determining employee status and its wording and interpretation have posed no significant difficulties."  Lump, et al., *supra* at 31.  This general statement from the committee does not describe the interpretation advanced by the Department in this matter or otherwise indicate how LIRC had interpreted this factor up to that point.  *See **id.***  Thus, the committee report provides no basis for us to presume that the legislature recognized LIRC's interpretation of this factor or that the legislature intended to endorse that interpretation by declining to amend this factor.

non-binding interpretation of § 108.02(12)(bm)2.h. or that the legislature was, in effect, endorsing that interpretation when it declined to amend this factor in 2010.

### 2. The Delivery Partners Had Recurring Business Liabilities and Obligations.

¶131 To repeat, this factor requires the employing unit to establish three points: (1) the individual has liabilities or obligations; (2) the liabilities or obligations are incurred as a part of the individual's "business"; and (3) the liabilities or obligations are "recurring." WIS. STAT. § 108.02(12)(bm)2.h. Amazon Logistics argues that it met its burden as to this factor because the delivery partners had recurring obligations related to maintaining a smartphone and a vehicle.[37] Based on the undisputed facts, we agree and conclude that the delivery partners had recurring business liabilities or obligations under the Agreement to purchase a mobile data plan, fuel for their vehicles, and automobile insurance.[38]

¶132 First, under the terms of the Agreement, the delivery partners were required to "provide and maintain a mobile device compatible with the Amazon

---

[37] Amazon Logistics also argues that the testimony of its witnesses demonstrates that delivery partners purchased "separate smartphone devices or secondary vehicles used specifically for delivery services." However, LIRC found that this testimony did not constitute "competent evidence" that the delivery partners made these purchases. We therefore do not consider this evidence in our analysis. *See* WIS. STAT. § 108.09(7)(f) ("[T]he court shall not substitute its judgment for that of the commission as to the weight or credibility of the evidence on any finding of fact.").

Amazon Logistics also points to testimony from a delivery partner that he deducted mileage costs from his income taxes owed as a business expense tax deduction. However, Amazon Logistics does not explain how an income tax deduction translates to facts that are relevant to this factor. In any event, we need not address these deductions because we conclude that this factor is satisfied by the delivery partners' other obligations. *See* **Barrows**, 352 Wis. 2d 436, ¶9.

[38] Amazon Logistics argues—and the Department does not dispute—that this factor can be satisfied with proof of recurring business liabilities or obligations required under an individual's contract with the employing unit. We agree. Thus, if the contract contains such liabilities or obligations, then the employing unit need not prove that each individual subject to that contract followed through with those liabilities or obligations.

Flex app." LIRC found that the delivery partners were required to bear the costs of maintaining "a data plan to utilize the smartphones' technologies and capabilities." The parties do not dispute that this is a "liability" or "obligation" for the purposes of this factor. Further, the requirement to maintain a mobile data plan is a "business" liability or obligation because the delivery partners were required to incur that expense as part of their business of performing delivery services for Amazon Logistics. It does not matter in this context that the delivery partners may have purchased their mobile data plans prior to performing services for Amazon Logistics or that they may have used their mobile data plans in part for personal use. What matters is that the delivery partners were required to purchase and maintain a mobile data plan as a part of their business of delivering packages. In addition, the Department does not dispute that the cost of a mobile data plan is a recurring expense. Thus, we conclude that the delivery partners had a recurring business liability or obligation to maintain a mobile data plan for their smartphones.

¶133 Second, LIRC found that the delivery partners were required to provide and maintain a motor vehicle.[39] As part of this obligation, the Agreement required the delivery partners to pay for the costs of fuel for their vehicles. Because fuel is necessary to operate a vehicle, the costs of purchasing fuel are a "liability" or an "obligation" for the purposes of this factor. Further, the costs of fuel are a "business" liability or obligation because the delivery partners were required to incur these costs as a part of their business of delivering packages for Amazon Logistics. Like the cost of purchasing a mobile data plan, the costs of fuel may be

---

[39] We note that the Agreement does not require that the delivery partners provide a motor vehicle. Nonetheless, none of the parties dispute LIRC's finding that a motor vehicle was needed to perform services under the Agreement, and we agree that, based on the facts in the record, those services could not reasonably have been performed in a timely manner on foot, bicycle, or public transportation.

a business obligation even if the delivery partners initially purchased that fuel in part for personal purposes. In addition, these costs were a "recurring" obligation because experience demonstrates that drivers must periodically purchase fuel for their vehicles to operate.

¶134 Third, as part of their obligation to provide a motor vehicle under the Agreement, the delivery partners were required to maintain automobile insurance coverage as required by applicable laws. The parties do not dispute that this is an "obligation" for the purposes of this factor. Further, the requirement to maintain automobile insurance is a "business" obligation because the delivery partners were required to provide a vehicle and maintain automobile insurance in order to perform delivery services under the Agreement. The Department is correct that Wisconsin law requires individuals to maintain automobile insurance for their personal vehicles, *see* WIS. STAT. § 344.62, but that fact does not alter our conclusion. As explained, nothing in the text of the factor indicates that the individual's business obligation must be incurred solely for business purposes. As a result, the requirement to purchase automobile insurance is still a business obligation even if the individual was also required to incur that expense to fulfill another legal obligation. In addition, the parties do not dispute that the obligation to pay automobile insurance premiums is a "recurring" obligation. *See Varsity Tutors*, 2019 WI App 65, No. 2018AP1951, ¶37.

¶135 In sum, we conclude that Amazon Logistics met its burden as to the factor set forth in WIS. STAT. § 108.02(12)(bm)2.h.

## I. Amazon Logistics Did Not Prove that The Delivery Partners Were Not Economically Dependent Upon Amazon Logistics With Respect to the Services Performed.

¶136    The ninth factor in WIS. STAT. § 108.02(12)(bm)2. requires that "[t]he individual is not economically dependent upon a particular employing unit with respect to the services being performed." Sec. 108.02(12)(bm)2.i. In analyzing a similar factor under a former version of § 108.02(12), this court concluded that "economic dependence is not a matter of how much money an individual makes from one source or another. Instead, it refers to the survival of the individual's independently established business if the relationship with the putative employer ceases to exist." *Larson v. LIRC*, 184 Wis. 2d 378, 392, 516 N.W.2d 456 (Ct. App. 1994) (citing § 108.02(12)(b)2. (1991-92)). An individual is likely not economically dependent if the individual "performs services and then moves on to perform similar services for another." *Keeler*, 154 Wis. 2d at 633. However, an individual is likely economically dependent if the individual's business would cease to exist if the relationship with the employing unit ended. *Larson*, 184 Wis. 2d at 392.[40]

¶137    LIRC found that this factor was not met. LIRC explained that Amazon Logistics failed to present evidence that the delivery partners performed services for other entities either during or before their relationship with Amazon Logistics or that they would continue to perform delivery services after ceasing to perform work for Amazon Logistics. LIRC found that the delivery partner who

---

[40]    As noted, this former version of WIS. STAT. § 108.02(12) asked, in part, whether the individual's services for the employing unit "have been performed in an independently established trade, business or profession in which the individual is customarily engaged." Sec. 108.02(12)(b)2. (1991-92). In *Keeler*, this court held that one question to be considered in this inquiry is "economic dependence." *Keeler*, 154 Wis. 2d at 633. This court's discussions in *Keeler* and *Larson v. LIRC*, 184 Wis. 2d 378, 392, 516 N.W.2d 456 (Ct. App. 1994), are instructive in interpreting the current language of § 108.02(12)(bm)2.i.

testified at the hearing did not have any "customers" other than Amazon Logistics. These are findings of fact to which we must defer and weigh heavily against concluding that Amazon Logistics has satisfied its burden as to this factor.

¶138 Amazon Logistics argues that it satisfied this factor because a former area manager for Amazon Logistics testified at the hearing that many of the delivery partners arrived at the warehouse in vehicles displaying signs for other delivery companies such as Uber, Lyft, and GrubHub. However, as noted earlier in this opinion, LIRC rejected this testimony from the former area manager and found that this testimony was not supported by "credible and substantial evidence" because it was "largely based on hearsay, speculation, and conjecture." We will not disturb LIRC's finding as to the weight or credibility of this testimony. *See* WIS. STAT. § 108.09(7)(f) ("[T]he court shall not substitute its judgment for that of the commission as to the weight or credibility of the evidence on any finding of fact.").

¶139 Amazon Logistics also argues that the Agreement expressly permitted the delivery partners to perform similar delivery services for other entities. However, as explained earlier in this opinion and based on the wording of this factor, Amazon Logistics is required to prove this particular factor "by contract and in fact." *See* WIS. STAT. § 108.02(12)(bm). That the delivery partners had the opportunity to perform delivery services for other entities does not by itself satisfy this factor. Thus, because Amazon Logistics did not provide any evidence as to the delivery partners' other sources of income or the services that the delivery partners provided for other employing units, Amazon Logistics failed to demonstrate that the delivery partners were not economically dependent on Amazon Logistics.

¶140 In sum, we conclude that Amazon Logistics did not meet its burden as to the factor set forth in WIS. STAT. § 108.02(12)(bm)2.i.

**CONCLUSION**

¶141 For the foregoing reasons, we conclude that Amazon Logistics satisfied its burden as to five factors of WIS. STAT. § 108.02(12)(bm)2.: b., d., e., g., and h. Because Amazon Logistics did not satisfy its burden as to six or more factors, we conclude that LIRC correctly determined that the delivery partners at issue qualify as "employees" under § 108.02(12). Therefore, we reverse the order of the circuit court and remand to the circuit court with directions to enter an order consistent with this opinion confirming LIRC's order.

*By the Court.*—Order reversed and cause remanded with directions.